In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2229

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ELISEO CONTRERAS,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond
Division.
No. 99 CR 26--Rudy Lozano, Judge.

ARGUED SEPTEMBER 21, 2000--DECIDED APRIL 25,
2001

   Before ROVNER, DIANE P. WOOD, and WILLIAMS,
Circuit Judges.

   ROVNER, Circuit Judge.  A jury convicted
Eliseo Contreras on charges that he
conspired with others to possess cocaine
with the intent to distribute the
narcotic, see 21 U.S.C. sec. 846, and
that he possessed cocaine with the intent
to distribute on five separate occasions,
see 21 U.S.C. sec. 841(a)(1). Judge
Lozano ordered him to serve a prison term
of 200 months. Contreras contends on
appeal that the record does not support
the inference that he conspired with one
or more other individuals in pursuit of
his drug trafficking. With that
contention we agree, and consequently we
will vacate his conviction on the
conspiracy charge. Contreras also argues
that the drug quantity for which the
district court held him to account at
sentencing lacks the support of reliable
evidence. That argument we do not find
persuasive, and so we shall affirm his
sentence as modified to reflect the
vacation of his conspiracy conviction.

I.

On four occasions in the Fall of 1997--September 29, October 15, November 6, and November 14--Contreras distributed cocaine to a paid confidential informant, Roberto Nunez. Nunez was working with East Chicago, Indiana police officer David Zamora, who was assigned to a high intensity drug trafficking task force of the U.S. Drug Enforcement Administration. These four transactions would become the basis for Counts Two through Five of the indictment against Contreras, which charged him with the possession of cocaine with the intent to distribute.

Contreras distributed cocaine to Nunez on two additional dates during this same time period--October 24 and October 28. According to Nunez, each of these transactions involved a third person. On October 24, Zamora dropped Nunez near El Sombrero bar, where Nunez had previously purchased cocaine from Contreras. On this occasion, he intended to purchase one ounce of cocaine. When he discovered that Contreras was not present at the bar, Nunez asked another man he knew to be involved in drug trafficking, Mike Villanueva, to call Contreras. Villanueva obliged him, left the bar, and later returned with an ounce of cocaine he said he had obtained from Contreras. On October 28, Nunez returned to El Sombrero, again with the intent to purchase an ounce of cocaine from Contreras; again Contreras was not present. Nunez testified that he asked a man by the name of Luis Manuel Eulloqui, known to him as "Triste," to get in touch with Contreras. Triste subsequently left the bar, walked to Contreras' residence, and returned to the bar with the cocaine that Nunez wanted.

Zamora's testimony regarding these two transactions differed from Nunez's in certain important respects. Zamora testified that after Nunez entered the bar on October 24, Nunez contacted him to report that someone in the bar had contacted Contreras, and that Triste would be leaving the bar to retrieve the cocaine from Contreras. Zamora and fellow surveillance agents subsequently observed Triste leave El Sombrero, walk to Contreras' apartment (five to six blocks away from the bar), enter, exit, walk back to the bar, and meet with Nunez. As for the October 28 transaction, surveillance agents, consistent with

Nunez's version, did see Triste leave the bar, walk to Contreras' residence, and go inside. But according to Zamora, Triste never came out. Instead Nunez contacted Zamora and explained that Contreras wanted Nunez to come to his apartment. Nunez subsequently walked to the apartment and picked up the cocaine.

Based on the evidence obtained as a result of these transactions, Zamora procured a search warrant for Contreras' apartment, which members of the task force executed on November 25. Agents discovered a total of 829.6 grams of cocaine in Contreras' freezer, along with $5,000 in cash. According to Zamora, who participated in the search, the packaging of the cocaine (in three separate quantities of roughly 275 grams each) was indicative of distribution. Contreras' possession of this cocaine formed the basis for Count Six of the indictment. Agents also recovered a digital scale from a kitchen cabinet and a .38 caliber handgun loaded with hollow-point ammunition from a dresser. Contreras was present when his apartment was searched and was placed under arrest. According to Zamora, after Contreras was advised of his rights, he admitted that an unidentified Hispanic individual had dropped off a kilogram of cocaine at his residence on ten separate occasions in the previous six months.

At the close of the government's case-in-chief and again at the close of all evidence, Contreras moved for a judgment of acquittal on all charges in the indictment, including the conspiracy charge set forth in Count One. The court denied these motions, and the jury convicted him on all counts.

In his pre-sentence report, the probation officer recommended that Contreras be sentenced based on a drug quantity of 11.2148 kilograms of cocaine. See United States Sentencing Guidelines sec. 1B1.3. That quantity included the 135.2 grams of cocaine that Contreras sold to Nunez on the four occasions referenced in Counts Two through Five of the indictment, the 829.6 grams of cocaine that was discovered in the search of Contreras' apartment on November 25, another 0.25 kilograms of cocaine corresponding to the $5,000 in cash (presumed to be drug proceeds) found in

Nunez's freezer on the same date, and an additional ten kilograms which, according to Contreras' statement to Zamora, the unknown Hispanic male had distributed to Contreras in the months preceding his arrest.

Contreras objected to the inclusion of the ten kilograms, denying that he had ever made a statement to Zamora admitting receipt of this amount. In view of the objection, the district court took evidence as to the appropriate drug quantity. Zamora took the witness stand, and he again testified that Contreras had admitted receiving ten one-kilogram quantities of cocaine from the unidentified Hispanic male. But, Zamora now testified, Contreras said he had received these kilogram quantities at the rate of one per month over the ten months immediately preceding his arrest, not six months. Contreras himself testified at sentencing as well. According to Contreras, Zamora never asked him anything about the quantities of cocaine he had trafficked.

The district court credited Zamora's testimony, and thus concluded that the Hispanic male had supplied Contreras with ten kilograms of cocaine for distribution in the months preceding his arrest. The court found that Contreras had received three of these kilograms within the time frame of the conspiracy charged in the indictment--September through November 1997. Coupled with the other cocaine amounts involved in Counts Two through Six, this brought the drug quantity to roughly 3.9 kilograms. The court treated the remaining seven kilograms that Contreras received from the Hispanic male as relevant conduct. See U.S.S.G. sec. 1B1.3(2) & application note 9(B). Consequently, the court held Contreras to account for a total of 10.9 kilograms of cocaine./1 The inclusion of the 10 additional kilograms had the effect of raising the base offense level from 26 to 32. Adjustments for possession of a gun in the course of a drug offense and obstruction of justice, see U.S.S.G. sec.sec. 2D1.1(b)(1), 3C1.1, produced a final offense level of 36, and a sentencing range of 188 to 235 months. The court ordered Contreras to serve a prison term of 200 months.

II.

A.

The conspiracy charge against Contreras required, inter alia, proof that he and at least one other person agreed to possess cocaine with the intent to distribute. E.g., United States v. Billops, 43 F.3d 281, 284 (7th Cir. 1994), cert. denied, 514 U.S. 1030, 115 S. Ct. 1389 (1995). Although the government need not always establish specifically with whom the defendant conspired, see United States v. Stephenson, 53 F.3d 836, 846 (7th Cir. 1995), citing United States v. Smith, 995 F.2d 662, 666 (7th Cir. 1993), cert. denied, 510 U.S. 1056, 114 S. Ct. 718 (1994), it must nonetheless establish that a conspiratorial agreement existed between the defendant and another individual, see United States v. Carraway, 108 F.3d 745, 750 (7th Cir.) (per curiam), cert. denied, 522 U.S. 891, 118 S. Ct. 228 (1997). The existence of that agreement may be proved circumstantially. See, e.g., id. As we discuss in greater detail below, the evidence in this case reveals that Contreras transacted illicit business with a number of different individuals, purchasing cocaine from one and selling cocaine to or through several others. At one time or another, the government has suggested that all of these individuals were participants in a conspiracy with Contreras. Contreras, on the other hand, contends that the evidence at most discloses a buyer-seller relationship with these persons. Of course, in order to establish a conspiracy, "[w]hat is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself." United States v. Lechuga, 994 F.2d 346, 347 (7th Cir.) (en banc) (plurality), cert. denied, 510 U.S. 982, 114 S. Ct. 482 (1993); see also, e.g., United States v. Clay, 37 F.3d 338, 341 (7th Cir. 1994).

In assessing whether the evidence supports the notion that the defendant conspired with another narcotics trafficker, "we are looking for evidence of 'a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture.'" United States v. Pearson, 113 F.3d 758, 761 (7th Cir.) (quoting Clay, 37 F.3d at 341), cert.

denied, 522 U.S. 1035, 118 S. Ct. 641 (1997); see also United States v. Gee, 226 F.3d 885, 894 (7th Cir. 2000); United States v. Menting, 166 F.3d 923, 928 (7th Cir. 1999). Factors that bear on that assessment include the length of time that the seller affiliated with the buyer, the established method of payment (for example, whether the seller "fronted" the narcotics to the buyer), the extent to which the transactions were standardized, and the level of mutual trust between the buyer and seller. Gee, 226 F.3d at 894; United States v. Hach, 162 F.3d 937, 943 (7th Cir. 1998), cert. denied, 526 U.S. 1103, 119 S. Ct. 1586 (1999); Clay, 37 F.3d at 342; Lechuga, 994 F.2d at 363-64 (Cudahy, J., concurring in part and dissenting in part). "Although none of these factors is dispositive, if enough are present and point to a concrete, interlocking interest beyond individual buy-sell transactions, we will not disturb the fact-finder's inference that at some point, the buyer-seller relationship developed into a cooperative venture." Hach, 162 F.3d at 943. With these factors in mind, we turn to the record to assess whether the evidence permits the inference that Contreras conspired with any of the various individuals that the government has identified as putative co-conspirators.

One prospect, Roberto Nunez, may be ruled out quickly. Nunez, of course, purchased cocaine from Contreras on at least six occasions during the three-month period of the alleged conspiracy. But on each of these occasions, he was acting as a paid, confidential informant on the government's behalf. Because Nunez's goal was to expose, rather than to commit, a crime, there could not be the meeting of the minds required to establish a conspiratorial agreement. See United States v. Mahkimetas, 991 F.2d 379, 383 (7th Cir. 1993).

There are three principal alternative possibilities, each of which the government cited in its closing argument to the jury: Mike Villanueva, the man who, according to Nunez, obtained the cocaine for him from Contreras on the occasion of the October 24 transaction; Luis Manuel Eulloqui, a.k.a. Triste, who, again according to Nunez, assisted him with the acquisition of cocaine from

Contreras on October 28, and, according to Zamora, on October 24 as well; and the unknown Hispanic male, whom Nunez, according to Zamora, identified as his supplier of kilogram quantities of cocaine. Although it is possible that one or more of these individuals conspired with Contreras, the evidence of record does not support the inference that any of them in fact entered into a conspiratorial agreement with Contreras.

With respect to Villanueva, the evidence establishes at most that he obtained cocaine from Contreras for Nunez on one occasion. The jury reasonably could have concluded that by doing so, Villanueva aided and abetted Contreras' sale to Nunez. But the record does not reveal any prolonged cooperation with Contreras, nor any stake in the success of Contreras' trafficking--the type of evidence that usually signals a conspiratorial relationship. See Pearson, 113 F.3d at 761. Without additional evidence along these lines, Villanueva's assistance on this one occasion does not permit the inference that he conspired with Contreras. See United States v. Torres-Ramirez, 213 F.3d 978, 982 (7th Cir. 2000).

The evidence with respect to Triste is not much stronger. The jury might have credited Zamora's testimony concerning the October 24 transaction, which indicated that it  was Triste, not Villanueva, who obtained the cocaine from Contreras on that date. With respect to the October 28 transaction, on the other hand, the jury might have chosen to credit Nunez's testimony, which indicated that it was Triste who obtained the cocaine on that date. This is the most favorable take on the evidence in so far as Triste's prospects as a co-conspirator are concerned, because it has him not once but twice obtaining cocaine from Contreras for Nunez. What is lacking once again, however, is any evidence that Triste had a stake in Contreras' sales, for example, or evidence that Triste's assistance in these two instances was anything more than casual or happenstance.

The unidentified Hispanic male is perhaps the best candidate for the role of co-conspirator, in that, according to Zamora's testimony regarding Contreras'

post-arrest statement, he supplied ten one-kilogram quantities of cocaine to Contreras over a period of six to ten months. These repeat sales suggest that as buyer and seller, Contreras and his supplier had more than a transient relationship. Contreras' multiple purchases of one-kilogram quantities reveal a certain comfort and regularity in his dealings with the unidentified supplier. Yet, the evidence reveals nothing more about the circumstances and terms of Contreras' transactions with his supplier. There is no evidence, for example, that the supplier "fronted" the cocaine to Contreras such that his payment would derive from Contreras' re-sale of the drug. See, e.g., Torres-Ramirez, 213 F.3d at 982. There is no evidence that the supplier gave Contreras a favorable price on the cocaine on the expectation of future purchases. See United States v. Dortch, 5 F.3d 1056, 1065-66 (7th Cir. 1993), cert. denied, 510 U.S. 1121, 114 S. Ct. 1077 (1994), and cert. denied, 513 U.S. 1126, 115 S. Ct. 933 (1995), discussing United States v. Fort, 998 F.2d 542, 543, 546 (7th Cir. 1993); cf. Direct Sales Co. v. United States, 319 U.S. 703, 63 S. Ct. 1265 (1943). Nor is there any evidence, aside from the bare number of sales, of prolonged cooperation between Contreras and his supplier. See Lechuga, 994 F.2d at 349-50 (plurality). In short, there is no evidence whatsoever that permits one to infer that the interaction between Contreras and his unidentified supplier amounted to something more than a buyer-seller relationship, that is, "something more than a series of spot dealings at arm's length between dealers who have no interest in the success of each other's enterprise." Id. at 349. The multiple purchases by themselves, without any additional evidence of the kind we have mentioned, do not permit the inference that the unidentified supplier conspired with Contreras. United States v. Thomas, 150 F.3d 743, 745-46 (7th Cir. 1998) (per curiam); see also Lechuga, 994 F.2d at 349-50 (plurality).

One final prospect remains. Francisco Godinez was Contreras' landlord, and a utility bill addressed to Godinez, for the apartment that Contreras lived in, was among the items found in Contreras' apartment at the time of his arrest. The cocaine sales to Nunez underlying Counts

Four and Five of the indictment took place at this apartment. Further, the intermediaries who helped Nunez with the purchases he made on October 24 and 28 both walked to Contreras' apartment in order to obtain the cocaine. The substantial amount of cocaine found at the apartment at the time of Contreras' arrest obviously suggests that Contreras stored cocaine at that location as well. The apartment was, in sum, a locus for Contreras' drug trafficking. In the government's view, it is significant that Godinez was Contreras' landlord, and that the utility bill address to Godinez was found in Contreras' apartment. Those facts suggest to the government that there was a conspiratorial relationship between Godinez and Contreras.

These facts alone, however, do not permit the inference that there was an illicit agreement between Godinez and Contreras. So far as the testimony at trial revealed, Godinez was nothing more than Contreras' landlord. There was no evidence suggesting that Godinez was even aware of Contreras' drug trafficking, let alone that he was in some way a party to it.

At sentencing, it is true, the government elicited evidence from Agent Zamora implicating Godinez in Contreras' cocaine operation or vice-versa. Around the time of Contreras' arrest, according to Zamora, Godinez himself was arrested when he delivered 30 kilograms of cocaine to a DEA informant. Godinez later disclosed that shortly before the search warrant was executed on Contreras' apartment, he had removed some 23 kilograms of cocaine from that apartment, placed it (with Contreras' knowledge) into a vehicle parked in front of the apartment, and later moved the vehicle to another location. Zamora also indicated Godinez had engaged in discussions at the El Sombrero bar in front of a confidential informant and Contreras regarding the 30-kilogram sale that eventually culminated in Godinez's arrest. During a follow-up meeting between Godinez, Villanueva, and the informant regarding that sale, Godinez acknowledged that he and Contreras were co-owners of El Sombrero.

Whether or not this additional testimony would suffice to establish a conspiracy

between Contreras and Godinez is beside the point, however, given that the jury never heard this evidence. Consequently, we may not consider it. See Menting, 166 F.3d at 928 (additional information set forth in pre-sentence report cannot be considered in weighing sufficiency of evidence underlying defendant's conviction). The jury knew only that Contreras used his apartment to conduct narcotics-related business, that Godinez was Contreras' landlord, and that a utility bill addressed to Godinez was found in the apartment. Standing alone, these facts simply do not permit the inference that Godinez and Contreras had agreed to possess cocaine with the intent to distribute.

Contreras' conspiracy conviction must therefore be vacated. The vacation of this conviction will have little practical effect on Contreras' sentence. The drug quantity attributed to him for sentencing purposes was based on transactions in which Contreras himself engaged, as opposed to the transactions of co-conspirators. Consequently, neither the relevant drug quantity, nor the applicable sentencing range, turned on the conspiracy conviction, and there is absolutely no indication in the record that the sentence Judge Lozano imposed was affected by that conviction. Pragmatically speaking, the sole detriment that Contreras suffered by virtue of the conspiracy conviction was an additional special assessment of $100./2 Consequently, we see no need to remand the case for re-sentencing. We shall simply modify the judgment to reflect removal of the special assessment imposed pursuant to Contreras' conviction on Count One of the indictment.

B.

The quantity of narcotics that the district court attributes to the defendant for sentencing purposes is a finding of fact that we review for clear error. E.g., United States v. Huerta, 239 F.3d 865, 875 (7th Cir. 2001). The bulk of the 10.9 kilograms of cocaine that Judge Lozano attributed to Contreras rested on a single piece of evidence-- Zamora's testimony that Contreras told him he had received ten, one-kilogram quantities of cocaine from his unidentified supplier in the months

preceding his arrest. Sentencing determinations must be based on reliable evidence. United States v. Beler, 20 F.3d 1428, 1432-33 (7th Cir. 1994). Contreras argues that Zamora's testimony is unreliable for two reasons. First, there are inconsistencies in Zamora's testimony about Contreras' trafficking. According to Zamora's testimony at trial, Contreras said that his supplier distributed the ten kilograms of cocaine to him in the six months preceding his arrest. Tr. 231. At the sentencing hearing, however, Zamora said Contreras had received the ten kilograms over ten months, not six. Sentencing Tr. 45. In addition, at trial, Zamora indicated that Contreras was prepared to sell Nunez a quarter kilogram of cocaine for $8,000. Tr. 232. At sentencing, however, Zamora insisted that the price was $6,200. Sentencing Tr. 43-44. Second, there is no independent evidence corroborating Contreras' post-arrest statement, which of course Contreras denies having made.

Notwithstanding the inconsistencies in Zamora's testimony, we find no clear error in the district court's drug quantity finding. The fact that there is no evidence corroborating Zamora's testimony as to the amounts of cocaine Contreras received from his supplier did not preclude Judge Lozano from relying on it. No one was more qualified than Contreras himself to put a number on the amounts of cocaine he was purchasing and re-selling, and Zamora was simply recounting what Contreras told him in this regard. Whether or not to believe Zamora called for a credibility assessment that Judge Lozano, having heard both Zamora and Contreras testify, was uniquely situated to make. See, e.g., United States v. White, 240 F.3d 656, 661 (7th Cir. 2001). The inconsistencies in Zamora's testimony as to the time period in which Contreras had received the cocaine and the price he paid for it are not unimportant. But they were exposed at the sentencing hearing and no doubt considered by Judge Lozano. The judge was satisfied that Zamora had accurately recounted Contreras' admission as to the cocaine he had received from his unidentified supplier. Sentencing Tr. 90-91. We find nothing in the record that cast such doubt on Zamora's credibility as to have precluded Judge Lozano from relying on his testimony. See, e.g.,

United States v. Woods, 148 F.3d 843, 847
(7th Cir. 1998).

III.

Because we find the evidence insufficient to support Contreras' conviction on the conspiracy charge set forth in Count One of the indictment, we vacate that conviction. Finding no clear error in the drug quantity that the district court attributed to Contreras for sentencing purposes, we affirm his sentence. The judgment shall be modified, however, to relieve Contreras of the obligation to pay a special assessment pursuant to his conviction on Count One of the indictment, which we have vacated.

AFFIRMED AS MODIFIED.

/1 As best we can determine from the record, the district court ultimately excluded from the total the one-quarter kilogram of cocaine corresponding to the $5,000 found in Contreras' freezer at the time of his arrest. At the sentencing hearing, the court seemed to indicate that it would include this amount in the total, in line with the probation officer's recommendation. Sentencing Tr. 91, 122, 123-24. However, if the one-quarter kilogram had been included, the drug total would have been approximately 11.2 kilograms. Either total would have resulted in the same offense level, however, so the disparity is unimportant. See U.S.S.G. sec. 2D1.1, Drug Quantity Table.

/2 Of course, the assessment alone requires us to review the sufficiency of the evidence underlying the conspiracy conviction. Ray v. United States, 481 U.S. 736, 107 S. Ct. 2093 (1987) (per curiam).