In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-3012 & 00-3228

United States of America,

Plaintiff-Appellee,

v.

Enoch Nubuor and Sulley Salami,

Defendants-Appellants.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98 CR 23--Robert W. Gettleman, Judge.

Argued October 22, 2001--Decided December 12, 2001


   Before Flaum, Chief Judge, and Ripple and
Williams, Circuit Judges.

   Flaum, Chief Judge.  After a joint jury
trial, Enoch Nubuor was convicted of
engaging in a conspiracy to distribute
heroin and for possession of heroin with
an intent to distribute. At the same
trial, Sulley Salami was also convicted
of engaging in a conspiracy to distribute
heroin. Nubuor and Salami have filed the
instant appeal contesting the sufficiency
of the evidence presented against them,
several of the district court's
evidentiary rulings, and the district
court's sentencing procedures. For the
reasons stated herein, we affirm the
convictions of both Nubuor and Salami and
the sentences imposed by the district
court.

I.  BACKGROUND

   In 1997, in an effort to penetrate and
disband a heroin ring operating in
Chicago, the FBI used a paid informant to
infiltrate a suspected drug ring's
distribution chain. This informant
established contact with an individual
named Seth Bonsu. Over the course of
several weeks, Bonsu made numerous heroin
sales to the FBI informant. Enoch Nubuor
was present during some of the
transactions between Bonsu and the FBI
informant. On one occasion, after
completing a sale of heroin to the

government's agent, Bonsu met with Nubuor and entered Nubuor's automobile. On another occasion, on November 20, 1997, while Bonsu made an additional sale of heroin to the informant, Nubuor was waiting outside Bonsu's apartment in his automobile.

In December of 1997, the FBI informant began negotiating a significantly larger heroin deal with Bonsu. In devising this transaction, the FBI hoped to expose the members of Bonsu's supply and distribution chain. The FBI informant was instructed to solicit the sale of six kilograms of heroin from Bonsu. As the deal for the larger quantity of heroin began to take shape, Bonsu told the FBI informant that he would be able to provide four kilograms of heroin from three different sources./1 Ultimately, Bonsu and the FBI informant agreed that the larger heroin transaction would take place on January 14, 1998.

On January 13, 1998, Bonsu met with Salami at a Chicago restaurant. During this encounter, Salami provided Bonsu with a sample dosage of heroin. The next day, January 14, Bonsu called the FBI informant at around 8:04 a.m. After this telephone call, Bonsu immediately paged Salami three times and called Nubuor twice. The FBI informant and Bonsu then met. At this meeting, Bonsu explained that he had arranged to get four kilograms of heroin from three separate sources: one source would provide four hundred grams of heroin, a second source would supply six hundred grams, and a third source would supply the balance. After a request from the FBI informant, Bonsu agreed to supply a sample dosage of heroin.

FBI agents arrested Bonsu just after he gave the informant the requested sample. After his arrest, Bonsu agreed to cooperate with the agents and made several tape-recorded telephone calls. Bonsu first called a distributor named Oyesile. In that call, Bonsu told Oyesile to call or page him, so that Bonsu could pick up the drugs. Oyesile responded to Bonsu by saying, "Okay, the same thing like Enoch, Enoch." Bonsu then told Oyesile that he would like to receive "one" from Nubuor; Oyesile responded, "[y]eah, I got the same thing just like Enoch."

On the following day, Bonsu made a recorded telephone call to Nubuor. In that call, Bonsu told Nubuor that he had been arrested and to "be careful with yourself and the four that you said you will give me, it is still in the foam, remove it from there. And your friend, go and talk to him well. They were watching you all the while I was coming there." Nubuor responded to these comments with "Eh-heh." Nubuor gave the same response when Bonsu referred to "that small thing you gave me."/2

On January 16, 1998, FBI agents went to Salami's residence. With Salami's consent, the agents conducted a search of the residence. After the search, Salami agreed to make a statement to the FBI. In that statement, which was later admitted into evidence at trial, Salami admitted to participating in the planning of the January 14th transaction with two other individuals, Bonsu and Biliki Brimah. In addition, Salami admitted to having known Bonsu for two years. However, Salami stated that he had only discussed drug transactions with Bonsu in the weeks leading up to the January 14th transaction.

Salami also stated that he had met Bonsu on January 13, 1998, and on that date he provided Bonsu with a small plastic bag containing a sample dosage of heroin. According to Salami, he had received the sample of heroin from Brimah. Salami also admitted that he had recent contacts with Brimah and that she had been making efforts to contact him to receive payment for a consignment of 50 grams of heroin which she had provided him. After making the above statement, Salami agreed to cooperate with the government against Brimah. Over the next several days, Salami made numerous telephone calls to Brimah and also met with her. Ultimately, Salami was able to purchase 100 grams of heroin from Brimah./3

On January 23, 1998, the FBI arrested Nubuor and conducted a consent search of his apartment. Nubuor admitted that he had been selling heroin at his place of employment; however, he refused to name the individuals who supplied him with heroin. After searching both Nubuor's apartment and person, FBI agents found 5.9 grams of heroin.

On March 3, 1999, both Nubuor and Salami were indicted for offenses related to the trafficking of heroin. Count I of the indictment charged Nubuor and Salami with conspiring with each other and others to distribute heroin. Nubuor was also charged with distribution of heroin and possession of heroin with intent to distribute.

During the course of the trial, after Salami had withdrawn from cooperating with the government's case, the government sought to admit Salami's post-confession transactions with Biliki Brimah as evidence of his participation in the conspiracy. The district court admitted these transactions into evidence. At trial, pursuant to Federal Rule of Evidence 801(d)(2), Salami sought to admit a statement made by a prosecutor as an admission by a party opponent. The district court denied Salami's motion.

After the conclusion of the trial, both Nubuor and Salami were found guilty of engaging in a conspiracy to distribute heroin. Nubuor was also found guilty of possession of heroin with intent to distribute. The district court then commenced sentencing. After reviewing the Federal Sentencing Guidelines and the Apprendi v. New Jersey case, the district court concluded that Nubuor was responsible for 1.5509 kilograms of heroin. Nubuor and Salami were then given the respective sentences of 121 and 120 months in the penitentiary.

In the instant appeal, both Nubuor and Salami contest the sufficiency of the evidence presented at trial. Both claim that the evidence admitted against them fails to support their convictions on conspiracy charges. Separately, Nubuor appeals the sentencing determinations reached by the district court. According to Nubuor, the district court, in holding him responsible for 1.5509 kilograms of heroin, committed clear error.

Salami contends that the district court abused its discretion in admitting Salami's post-confession drug purchases. Those purchases were offered and admitted as evidence of Salami's participation in a drug conspiracy. Lastly, Salami claims that the district court committed clear error when it denied his motion to admit

a prosecutor's statements as a statement against the government's interest.

## II.  DISCUSSION

After considering the arguments raised by both Nubuor and Salami, we find them to be unavailing.

## A.  Sufficiency of Evidence

Both Salami and Nubuor contend that the evidence adduced at trial was insufficient to support their convictions for engaging in a conspiracy to distribute heroin. Recently, this court set forth that a drug sale in and of "itself cannot [form the basis of a] conspiracy, for it has no criminal object." United States v. Torres-Ramirez, 213 F.3d 978, 981 (7th Cir. 2000). Instead, to establish the existence of a conspiracy, there must be an "agreement to commit some other crime beyond the crime constituted by the sale agreement itself." Id. According to Nubuor and Salami, the government failed to present evidence at trial that could prove that they were involved in a scheme to commit a crime that extended beyond the buyer-seller agreement.

When examining an individual's participation in a conspiracy, proof of additional crimes may be based entirely upon circumstantial evidence. See, e.g., United States v. Pagan, 196 F.3d 884, 889 (7th Cir. 1999), cert. denied, 530 U.S. 1283 (2000). Factors that may be considered, particularly in the area of drug conspiracies, include: the length of affiliation between the parties; the existence of an established method of payment; the extent to which transactions between the parties are standardized; and the demonstrated level of mutual trust between the alleged participants. See United States v. Contreras, 249 F.3d 595, 599 (7th Cir. 2000). No one circumstantial factor will typically be dispositive. Id. However, "[i]f enough point in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals themselves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture." Id.

With respect to both Nubuor and Salami, we find that ample facts were adduced at trial to support the jury's verdict that both individuals engaged in a conspiracy to distribute heroin.

## 1.  Enoch Nubuor

In its case against Nubuor, the government presented the testimony of Carla Evans, the girlfriend of FBI informant, Bonsu. In her testimony, Evans stated that she often saw Nubuor at Bonsu's apartment. Evans also testified that Bonsu told her that Nubuor was his regular supplier of drugs and that Nubuor was to contribute quantities of heroin to help complete the January 14 sale. This testimony was bolstered by the fact that Nubuor was seen (by government agents) with Bonsu after numerous smaller drug sales had taken place. The jury also heard the recorded telephone calls that Bonsu made when he was cooperating with the government. On these tapes, in a conversation between Bonsu and Oyesile, Oyesile states, when speaking about the quantity of drugs he was to furnish Bonsu, "I got the same thing just like Enoch." Similarly, the jury heard a telephone call that occurred between Bonsu and Nubuor. In that call, Nubuor replied with an affirmative "Eh-heh" when Bonsu told him to get rid of the "four you said you will give me."/4 Lastly, the jury was able to see and examine the frequency of contacts between Nubuor and Bonsu. Bonsu and Nubuor contacted each other 97 times in the two months leading up to the January 14 transaction.

All of the above facts, together, allow a jury to find that Nubuor was a party to a conspiracy. The testimony of Carla Evans, the sightings of Nubuor at multiple drug transactions, and the significant amount of phone traffic between Bonsu and Nubuor, establish that Bonsu and Nubuor knew one another for some time and that they worked together comfortably. The duration of the relationship between Bonsu and Nubuor and the trust the two seemed to demonstrate toward one another indicate something more substantive and expansive than "an arm's length retail-type sale" of drugs. United States v. Ferguson, 35 F.3d 327, 331 (7th Cir. 1994). When presented with the above facts, it is clear that a

"rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

2. Sulley Salami

The facts surrounding Salami's involvement in the January 14, 1998 heroin transaction also support his conviction on conspiracy charges. First and foremost, Salami admitted to federal agents that he had known Bonsu for two years and that he had discussed the January 14, 1998 sale of heroin with Bonsu. Although Salami argues that he never discussed drugs with Bonsu prior to the planning of the January 14 transaction, that assertion is dramatically undercut by the facts presented at trial. When viewed with a critical eye, those facts indicate that Salami and Bonsu operated with a distinct level of trust. For example, before the effectuation of the January 14 sale of heroin, Salami provided Bonsu with a sample dosage of heroin prior to receipt of payment. Evidence of fronting, or "providing drugs 'up front' [and without payment] may establish the existence of a conspiracy because it indicates cooperation and trust" between the parties. Ferguson, 35 F.3d at 221. Similarly, Bonsu used a special numerical code when paging Salami. That code indicated to Salami that Bonsu was attempting to contact him. The use of this special code indicates that both Bonsu and Salami had a systematic way of communicating and transacting business.

Salami's post-confession drug transactions also support the jury's verdict. After his arrest and confession, Salami agreed to cooperate with government to implicate Biliki Brimah in the government's investigation./5 During the course of his cooperation, Salami purchased up to 100 grams of heroin from Biliki Brimah. These post-confession transactions between Brimah and Salami were standardized in the method of transfer, with the drugs consistently wrapped inside a napkin. Furthermore, the facts support a conclusion that there was a level of trust and familiarity between Brimah and Salami. Brimah was willing to "front" modest to large quantities of drugs on Salami's behalf, as evidenced by

her provision of a sample dosage to Salami on January 13, 1998.

The above facts, standing alone, support the jury's conclusion that Salami participated in a conspiracy to distribute heroin.

B. Admission of Salami's Post-Confession Drug Transactions

Salami's next contention is that the district court abused its discretion when it admitted Salami's post-confession drug transactions, which occurred while he was working as a government agent, as evidence of his participation in a conspiracy to distribute heroin. According to Salami, the district court should have excluded those transactions from evidence pursuant to Federal Rule of Evidence 403. Salami's principal argument is that it is unfair for the government to use evidence of his post-arrest and post-confession actions against him because those actions occurred while he was cooperating with the government.

We find that Salami's arguments on this issue lack merit. This circuit's caselaw supports the entry of a defendant's post-arrest cooperation as evidence against a defendant, particularly after that defendant has withdrawn from his cooperation with the government./6 See, e.g., United States v. Hubbard, 22 F.3d 1410, 1416-17 (7th Cir. 1994). Lastly, we find that any prejudicial effect attendant upon the admission of Salami's post-arrest actions was blunted by the fact that Salami was afforded ample opportunity to highlight (in both cross-examination and in closing argument) that the disputed purchases occurred at the direction of the government.

C. Denial of Salami's Motion to Admit Prosecutor's Statements

Salami's next claim is that the district court erred in excluding statements made by a prosecutor during Bonsu's plea hearing. Salami offered those statements into evidence pursuant to Federal Rule of Evidence 801(d)(2). During the plea hearing of Bonsu, the prosecutor stated that Bonsu received sample dosages of heroin from three suppliers: Oyesile, Nubuor, and Salami. The prosecutor then stated that Bonsu gave the sample dosages

received from Oyesile and Nubuor to the FBI's agent, in anticipation of the January 14 deal. The prosecutor did not mention what Bonsu did with the sample dosage provided by Salami. At trial, the government introduced evidence that Salami admitted to providing Bonsu with a sample dosage of heroin on January 13, 1998. In addition, Salami, in cross-examination, elicited testimony from an FBI agent indicating that Bonsu also passed the sample dosage received from Salami onto the FBI informant.

After this alleged inconsistency was exposed, Salami attempted to introduce the prosecutor's statements at the Bonsu plea hearing as a judicial admission, pursuant to 801(d)(2). The district court denied Salami's motion, noting that the prosecutor's statements were based upon information gleaned from Bonsu and that it "could hardly hold what [Bonsu] said and what the government was willing to stipulate with Mr. Bonsu about as a judicial admission[,] given that Mr. Bonsu was not competent at the time." In his appeal, Salami argues that the district court should have admitted the prosecutor's statements as admissions of a party opponent.

We need not address Salami's contention that a government prosecutor's statements may be admitted into evidence as a statement of a party opponent to conclude that, even under the most searching review, the district court's ruling would amount to harmless error./7 Salami admitted to engaging in fulsome discussion with Bonsu regarding the January 14 heroin transaction and admitted that he supplied Bonsu with a sample dosage of heroin. It would strain the bounds of reason and logic to assume that a jury would change its determinations about Salami's involvement in the drug conspiracy, in the face of a minor misunderstanding over what happened to the sample dosage of heroin he supplied to the government's informant. Furthermore, this is not a case where the alleged erroneous exclusion of evidence precluded Salami from presenting his defense. See, e.g., United States v. Peak, 856 F.2d 825, 834-35 (7th Cir. 1988). Therefore, we find Salami's arguments on this matter to be unavailing.

D.  The District Court's Sentencing
Determinations

   Nubuor argues that the district court
erred in determining the amount of heroin
that he was responsible for at his
sentencing. We review the district
court's determination of drug quantity
for clear error. See United States v.
Magana, 118 F.3d 1173, 1205 (7th Cir.
1997).

   Nubuor was sentenced pursuant to USSG
sec.1B1.3(a)(1)(B). In sentencing
pursuant to that provision, a district
court is to consider "reasonably
foreseeable acts and omissions of others
in the jointly undertaken criminal
activity." USSG sec.1B1.3(a)(1)(B).
Furthermore, in the context of drug
distribution cases, we have held that a
defendant who has conspired with others
may be sentenced for drug quantities that
he did not handle, so long as he could
reasonable foresee that the drug
transactions would occur. See United
States v. McEntire, 153 F.3d 424, 438
(7th Cir. 1998). In reviewing the
district court's sentencing
determinations under the above standards,
we find that the district court did not
commit clear error.

   At the sentencing hearing, the district
court determined that Nubuor was
responsible for 1.5509 kilograms of
heroin. The district court reached this
figure by first concluding that Nubuor
was responsible for the amount of heroin
found on his premises and on his person:
5.9 grams. Next, the district court
determined that Nubuor was responsible
for an additional 400 grams of heroin.
This finding was based upon Nubuor's
recorded telephone conversation with
Bonsu, in which he acknowledged Bonsu's
remark (the "four that you said you will
give me") with an "Eh-heh." This
conversation, coupled with the fact that
Bonsu, in his settlement proffer, stated
that Nubuor had agreed to furnish 400
grams of heroin to the January 14 heroin
deal, support the district court's
findings.
   The district court then determined that
Nubuor and Salami "knew about each other
and their roles in the conspiracy" and
were accountable for all the heroin that
their counterpart could have foreseeably
delivered. Therefore, the district court

concluded that because Salami intended to deliver one kilogram of heroin to Bonsu, Nubuor should be found responsible for that additional kilogram. Evidence submitted at trial established that Nubuor was aware that various parties would contribute drug quantities to the January 14, 1998 transaction. Nubuor's awareness, coupled with the fact that "reasonable forseeability does not require that the co-conspirator be aware of the precise quantity in each of an ongoing series of illegal transactions," support the district court's determinations as to the additional kilo gram of heroin. United States v. Scroggins, 939 F.2d 416, 423 (7th Cir. 1991).

To reach the final sum, the district court determined that Nubuor should be held responsible for the quantities of heroin that Bonsu sold to the FBI informant, prior to the January 14th transaction. The total quantity of drugs sold in these transactions equals 115 grams. Evidence presented at trial established that Nubuor was present, and indeed was often consulted by Bonsu, when some of these transactions were executed. In this instance, we agree with the district court and find that it was reasonably foreseeable to Nubuor that these smaller transactions would be required to further the overall conspiracy to sell a far larger quantity of drugs.

E.  Apprendi

Lastly, pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000), both Nubuor and Salami claim that the district court should not have been allowed to find drug quantities by a preponderance of the evidence, in determining base offense levels under the Sentencing Guidelines. This court has recently rejected the appellants' arguments. United States v. Jones, 248 F.3d 671, 676-77 (7th Cir. 2001) (when ascertaining base offense levels, a district court may determine drug quantities by a preponderance of the evidence). Similarly, both Nubuor and Salami claim that Apprendi requirements should apply to mandatory minimum sentences. This court has expressly rejected such an argument. United States v. Sandoval, 241 F.3d 549, 551 (7th Cir. 2001).

III. CONCLUSION

For the foregoing reasons, we Affirm both the convictions and the sentences of the appellants in the instant case.

FOOTNOTES

/1 While negotiating this larger transaction, Bonsu had numerous phone conversations with both Nubuor and Sulley Salami. From November 2, 1997 to January 14, 1998, there were 97 contacts between Bonsu and Nubuor's telephones. Similarly, between December 27, 1997 and January 14, 1998, Bonsu contacted Salami's pager 29 times. When Bonsu paged Salami, he would use a special numerical code.

/2 Carla Evans, Bonsu's girlfriend at the time of the drug transactions, later testified that Nubuor was a regular presence at Bonsu's apartment and that Bonsu had told her that Nubuor regularly supplied him with heroin. Evans also testified that Bonsu told her he was going to get drugs from both Nubuor and Salami in order to complete the January 14 transaction.

/3 Salami later stopped cooperating with the government.

/4 Nubuor's statements on the recorded telephone calls do not provide great detail into his involvement in the conspiracy to sell drugs. However, Nubuor did not demur when asked about the heroin to be sold or when the details of the transaction were mentioned with great specificity.

/5 In his confession, Salami admitted to receiving 50 grams of heroin from Brimah on previous drug transactions.
/6 It should also be noted that the government did not attempt to use Salami's post-arrest actions to charge him with the substantive crimes committed at the government's behest. Rather, the cooperative purchases of heroin were offered to show that Salami operated with a level of trust and comfort with heroin distributors and was, therefore, likely to have been part of the conspiracy to distribute heroin.

/7 We note that in several other contexts this court, in criminal cases, excludes the statements of government agents and officers from admission under Rule 801(d)(2). The theory behind these exclusions is that those government agents do not have the authority to bind the United States and are generally disinterested in the outcome of the trial. See United States v. Zizzo, 120 F.3d 1338,

1352 n.4 (7th Cir. 1997).