**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juan C. RAMOS, a/k/a Pops,**
**Defendant–Appellant.**

No. 01–2560.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 30, 2002.

Decided March 8, 2002.

Before MANION, DIANE P. WOOD, TERENCE T. EVANS, Circuit Judges.

**ORDER**

A jury found Juan "Pops" Ramos, a 35-year-old member of the Maniac Latin Disciples, guilty of one count of conspiracy to possess and distribute cocaine and crack cocaine, 21 U.S.C. §§ 846 and 841(a)(1), one count of possession with intent to distribute crack cocaine, 21 U.S.C. § 841(a)(1), two counts of using a telephone in furtherance of the drug conspiracy, 21 U.S.C. § 843(b), and one count of possession with intent to distribute crack cocaine, 21 U.S.C. § 841(a)(1). Ramos now argues that his conspiracy sentence of 420 months' imprisonment violates the principles of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and that the government's evidence, which included recordings from wiretaps as well as testimony from cooperating gang members and Ramos's former girlfriend, was insufficient to support his conspiracy conviction. We affirm.

**I.**

Since the early 1980's, Juan Ramos has been a member of the Maniac Latin Disciples ("MLDs") streetgang. The MLDs operate primarily on the near northwest side of Chicago, in the Humboldt and Wicker Park neighborhoods. They align themselves with a loose consortium of gangs known as the "Folks Nation." The "Folks" include such gangs as the Satan Disciples, the Spanish Cobras, the Latin Jivers, and the Gangster Disciples. In general, "Folks" are opposed to the "People Nation," whose main constituent is the Latin Kings gang, but sometimes intrafamily rivalries over street-corner turf or perceived slights can erupt in a Folks civil war. The MLDs, as well as many other Chicago streetgangs, are organized into "sections" denominated by the particular street corners where members meet and sell drugs, e.g., Rockwell and Potomac or Beach and Paulina. These sections are hierarchal, with the younger "pee wees and foot soldiers" at the bottom, lieutenants ("1st C, 2nd C, and treasurer") above them, and a chief or governor at the top. Above the chiefs of the sections there are coordinators of larger areas, and above the coordinators there is the prince. Each of the sections have weekly meetings, or "juntas," at which members pay dues and discuss gang business. Dues are earned through the sale of drugs on street corners. On certain days, called "Nation Days," all proceeds from drug sales go to the gang. Some of the gang's money is sent to incarcerated MLDs, and the gang uses the rest to buy weapons with which to protect turf against rival gangs. Gang rules such as when and how drugs are sold and what drugs members can use are enforced through "violations," which are beatings by three or four gang members for various lengths of time (i.e., "one-minute violation," "two-minute violation").

Suspecting that the MLDs were becoming more heavily involved in the drug trade, the FBI began investigating the gang and Ramos in April 1997. Over the course of the investigation, which lasted until June 1999 when the government arrested approximately 30 gang members, the FBI, working with the Chicago Police Department, intercepted over 4,000 phone calls between Ramos and other parties (the FBI tapped five MLD phone lines including Ramos's). The prosecution presented over 100 of these calls at trial. In many Ramos discusses aspects of drug deals and drug dealing with other members of the MLDs: prices, quantities, loca-

tions for sales, promises of future sales, promises of future payments, and ways to defend their turf from rival gangs. Although Ramos and the other gang members often used code words for drugs (e.g., "onion" for ounce of cocaine), four cooperating witnesses who had been involved in some of the conversations and indicted as part of the conspiracy explained the intercepted conversations to the jury. So, for example, Lynn Johnson, Ramos's girlfriend during the nine months before the mass arrest, testified that saying she "needed something" during one recorded conversation meant she wanted to buy powder cocaine for resale to one of her customers. She further explained that saying she "need[ed] a lot" meant she needed one ounce of powder cocaine. Continuing to translate the cryptic conversation Johnson testified that Ramos had then told her that he had "finished that whole thing already," which Johnson understood to mean he had already sold all of his drugs. Johnson then informed Ramos that she would call one of Ramos's friends to see if he had cocaine to sell her. In a series of intercepted calls Ramos, Johnson, and Thomas Ross, a coconspirator and the main MLD drug supplier, discussed Johnson's purchase of the "onion" from another MLD named Waldy. Tellingly, Ramos referred to Waldy's cocaine as "the same shit" that either he or Ross would have sold Johnson. The government argued that the "same shit" reference was just one of the many pieces of evidence proving a cocaine-distribution conspiracy among Ramos, Ross, and other MLDs. Only common and accepted channels of distribution would assure Ramos that the cocaine Johnson purchased from one MLD would be the same as that purchased from another.

Over the course of the trial, the government presented the testimony of four cooperating witnesses, many recordings of Ramos's tapped phone conversations, testimony from FBI agents and Chicago police detectives regarding the investigation, and a drug sale between Ramos and an FBI informant. Also, it introduced physical evidence that included 23 grams of crack seized from Ramos, 8 grams seized from one of Ramos's codefendants, and 173 grams seized from an alleged MLD coconspirator. The defense presented very little evidence, instead opting to cast doubt on the credibility of the cooperating witnesses by highlighting that they all testified in exchange for government help at their sentencing hearings. The claim was that during the one or two weeks prior to trial they all "miraculously" recalled details of Ramos's involvement with the conspiracy. The jury, however, apparently believed the witnesses and returned guilty verdicts. In entering the verdicts, the jury specifically found that Ramos had conspired to possess with intent to distribute and to distribute in excess of 50 grams of crack and 5 kilograms of cocaine.

In Ramos's Presentence Investigation Report ("PSR") the probation officer recommended holding him accountable for distributing at least 1.5 kilograms of crack, resulting in a base offense level of 38. The PSR further recommended adding two levels under U.S.S.G. § 2D1.1(b)(1) because Ramos possessed a firearm while engaged in the drug conspiracy. It recommended four additional levels under U.S.S.G. § 3B1.1(a) because Ramos allegedly organized and led the drug conspiracy. Ramos objected to both of these recommended additions, arguing that because the jury did not make findings on either his gun possession or his organizational role in the conspiracy, *Apprendi* prevented the judge from using those factors to increase his sentence. At the sentencing hearing, however, the judge noted that the jury had found that Ramos distributed at least 50

grams of cocaine base, an offense that carries with it a statutory maximum penalty of life imprisonment. Therefore, the court held that *Apprendi* did not prevent the increase of Ramos's base offense level on account of his gun possession and leadership role in the conspiracy.

The court ultimately ruled that Ramos was a career criminal, placing him in criminal history category VI. It further determined that Ramos's base offense level would be 42 (38 plus 2 for firearm possession and 2 for a managerial role, as opposed to a leadership role, in the conspiracy). The resulting guideline range on the conspiracy count was 360 months to life imprisonment; the judge settled on 420 months. Ramos was also sentenced to 240 months' imprisonment for each of the other four counts of conviction; to run concurrently with each other and the 420 months.

## II.

■ On appeal Ramos first reasserts that *Apprendi* requires a jury finding beyond a reasonable doubt of *any* fact used to extend the length of imprisonment, not just those facts that increase the statutory maximum. We have, however, repeatedly rejected that argument, as have other circuits. *See, e.g., Hernandez v. United States*, 226 F.3d 839, 841–42 (7th Cir.2000); *United States v. Smith*, 223 F.3d 554, 565–66 (7th Cir.2000); *United States v. Robinson*, 241 F.3d 115, 119 (1st Cir.2001); *United States v. Garcia*, 240 F.3d 180, 184 (2d Cir.2001) (joining "the other nine circuits that have ruled ... that a guideline factor, unrelated to a sentence above a statutory maximum or to a mandatory statutory minimum, may be determined by a sentencing judge and need not be submitted to a jury" and collecting cases). Because his gun possession and managerial role did not increase the statutory maximum to which he was subjected nor extend

his sentence beyond that maximum, Ramos's argument that these facts should have been submitted to the jury is unavailing. *Hernandez*, 226 F.3d at 841–42.

■ Ramos also argues that the government presented insufficient evidence for the jury to convict him of conspiracy to possess and distribute cocaine and crack. We review a sufficiency of the evidence claim "in the light most favorable to the government and uphold a jury's decision if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Albarran*, 233 F.3d 972, 975 (7th Cir.2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Ramos's argument would fail even under a less deferential standard of review; the government's evidence was overwhelming.

In order to prove a drug conspiracy, the government must prove 1) an agreement between two or more persons to violate the drug laws, 2) the defendant's knowledge of the agreement, and 3) his intention to join it. *United States v. Billops*, 43 F.3d 281, 284 (7th Cir.1994). Factors we examine to assess whether a drug conspiracy existed include the "length of time that the seller affiliated with the buyer, the established method of payment (for example, whether the seller 'fronted' the narcotics to the buyer), the extent to which the transactions were standardized, and the level of mutual trust between the buyer and seller." *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir.2001).

The government presented ample evidence that Ramos conspired with Lynn Johnson, Thomas "Outlaw" Ross, and other gang members to possess and to distribute cocaine. Johnson testified that for approximately six months she purchased between an eighth of an ounce ("eightball") and an ounce of cocaine from Ramos two or three times a month for resale to

her customers. She further testified that Ramos would front her the cocaine, and that she would pay him after selling it. Johnson also explained several of the many recorded conversations in which she and Ramos discuss drug sales. The conversation regarding purchase of an "onion" for one of her customers was one such conversation; during another she asks Ramos for an eight-ball of crack for resale to a customer who was already "on his way." Ramos informs her that he is cooking the cocaine into crack so the customer will have to wait, to which Johnson replies "I don't know if he can wait. I doubt it. I'll call him back." The deal for the whole eight-ball fell through, Johnson testified, because Ramos was late getting the drugs to her and by that time the customer only wanted a sixteenth of an ounce.

With regard to the conspiracy between Ramos, Ross, and other gang members, Johnson testified that on approximately five occasions she walked into Ramos's house to find Ramos and his roommate, Carmelo Pedrazza, who was a member of the Latin Jivers gang, packaging cocaine for resale. She also described making several "runs" to Ross's house, where Ramos would pick up cocaine. An MLD named Lewis "Lou Dog" Franklin also testified that Ramos fronted him two ounces of cocaine every ten days for about a year in the mid- to late 1980's; Franklin would cook the cocaine into crack, bag it into $10 quantities, and distribute it to the "foot soldiers" of his MLD section for street-level sales. In 1997 or 1998, Franklin began to buy four-and-a-half ounces of crack or powder cocaine every other week from Ross, who often brought Ramos with him during these sale; the MLDs also sold this cocaine on street corners. Pablo "Bones" Navarrete, another MLD, testified that Ramos was Ross's "right hand man" in the MLD's, and that Ross was the MLD's main drug supplier. Eriberto "Ed-

die Munster" Estrada, a member of the Spanish Cobras gang who worked for Pedrazza delivering drugs and money, testified that his boss received many of his drugs from Ramos, and that when Pedrazza was not home Ramos would supply him. When Ramos supplied him, Estrada had to sell the drugs quickly because Ramos always demanded the money for the drugs soon after he had fronted them. According to Estrada, Ramos needed the money promptly because Ross, in turn, required quick payment for the drugs Ross had fronted Ramos. Estrada picked up an ounce or two of cocaine or crack every day for more than a year from Ramos's and Pedrazza's house. The differences in gang affiliation did not hinder the operation because, Estrada explained, Pedrazza, Ramos, and he had grown up together and "we were like the older generation of the guys. We always trusted each other."

Although the jury saw and heard substantially more evidence, this testimony alone establishes the existence of a conspiracy between Ramos, Johnson, Ross, and the other gang members. The cocaine distribution network apparently lasted much more than a year; the members often fronted drugs to each other and helped package them; there were regular, almost daily, pick-ups and deliveries of drugs and money, particularly by Estrada; and a high level of trust existed between the members, some of whom lived together. *See, e.g., United States v. Nubuor,* 274 F.3d 435, 444 (7th Cir.2001) (government proved a heroin conspiracy by showing that one conspirator bought heroin from another, conspirators knew each other for at least a few months, often had phone contact, and were seen together at multiple drug transactions); *United States v. Berry,* 133 F.3d 1020, 1023 (7th Cir.1998) (conspiracy established where one member bought crack from coconspirator, provided security services, made drug runs, and helped package the other's crack).

As at trial, Ramos's central rejoinder to the government's case is that the cooperating witnesses were not credible because they had "enhanced recall of facts relating to the Defendant during the time that their trial testimony was being prepared by the government for trial purposes." We have repeatedly held, however, that we will not "second-guess a jury's credibility determinations" absent extraordinary circumstances. *See, e.g., United States v. Buchmeier,* 255 F.3d 415, 420 (7th Cir. 2001), *cert. denied,* — U.S. ——, 122 S.Ct. 505, 151 L.Ed.2d 414 (2001); *United States v. McGee,* 189 F.3d 626, 630 (7th Cir.1999). Ramos points to no such circumstances.

## III.

The arguments presented in this appeal are frivolous. For the reasons stated above, we AFFIRM the district court.