In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3423

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BILLI ALAKA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 151-3—**Elaine E. Bucklo**, *Judge.*

ARGUED APRIL 20, 2010—DECIDED JULY 27, 2010

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendant-appellant Billi Alaka participated in a conspiracy to steal identifying information from customers of Washington Mutual bank and use it to make fraudulent transfers from their accounts. Alaka pleaded guilty to being a part of this conspiracy, but disputed the extent of his participation during his sentencing hearing. The district court found him responsible for the entire loss caused by the operation. Appellant claims that this decision amounted to clear error because

much of the damage was not foreseeable to him. We now affirm.

## I. Background

Defendant-appellant Billi Alaka pleaded guilty to one charge of conspiring to traffic and use one or more unauthorized access devices to obtain things of value aggregating $1000 or more, in violation of 18 U.S.C. § 1029(b)(2). The conspiracy sought to defraud Washington Mutual Bank ("WaMu") and its customers by using stolen account information to make unauthorized withdrawals. The individuals involved in the conspiracy were Alaka, Inyang Tomita, Jelil Adams, and James Arikpo. Arikpo worked at Washington Mutual and had access to personal account information. Tomita persuaded Arikpo to provide the customer account information to him for a fee. Tomita, Adams, and Alaka then used the customer data to generate fake identification featuring the name and personal details of a known WaMu account holder next to a photograph of a conspirator, open fraudulent accounts on behalf of the customers, or establish online access to the real accounts without notifying their owners. Appellant and his co-conspirators used these methods to siphon money out of the target accounts via online transfers, counterfeit checks, and withdrawals where a conspirator pretended to be the account owner.

At sentencing, the government contended that the conspiracy caused a total loss of $267,227. The district court agreed, holding Alaka, Arikpo, and Tomita each responsible for the full scope of the scheme. Alaka now

argues that evidence ties him only to discrete with-drawals amounting to about $100,000, and that he could not reasonably foresee the remainder of the transactions. Thus, while Alaka admits responsibility for the loss attributable to unauthorized withdrawals he personally made and the withdrawals made by Tomita while Alaka was present, he denies responsibility for any loss associated with online transfers and counterfeit checks.

At Alaka's sentencing hearing, the government relied on appellant's own post-arrest statements and the testimony of United States Secret Service Special Agent Brian Speedy. Agent Speedy described the investigation into the conspiracy and the individual transactions that comprised it. With respect to losses borne by individual account holders injured by the scheme, his testimony established the following:

Eva Lichtenberg: James Arikpo accessed Lichtenberg's account, leading to a loss of $32,300 through several methods of withdrawal. One online bill payment was made from her account to a Citi Mastercard held in the names of Jillian Campione and Travis Tolle. The government subsequently found a fake ID with Alaka's photograph and the name "Travis Tolle." There was also an online transfer and an online bill payment from the Lichtenberg account to an account in the name of David Butler, which one of the co-conspirators admitted to opening. The government was able to trace money that flowed into the Butler account through several other accounts and eventually to Alaka, who admitted withdrawing the funds and giving them to Adams.

Carol Krashen: A phone call was made to transfer money from Krashen's account to another account under the same name at Washington Mutual. A counterfeit check was then written in the amount of $65,100. This check was deposited into a bank account in New York under the name Nova Depalois. Agent Speedy did not testify to any direct connections between the conspiracy and this check at the sentencing hearing. However, the government contends, and Alaka does not contest, that this account had been accessed by Arikpo prior to the loss.

Doug McMillian: McMillian incurred a loss of $16,514.47 through online transfers. One of the transfers went to an account under the name David Butler. Jelil Adams opened this account and used it to initiate a series of transfers that culminated in some of the money appearing in an account owned by Alaka.

David Williams: Williams lost $14,912.66 from his WaMu account through online transfers and bill payments. Initially, someone transferred $35,600 from Williams' genuine account to another one fraudulently created in his name. The perpetrators then sent online checks totalling $20,500 from that dummy account to an account at Fifth Third Bank under the name "Il Sin." Alaka was photographed accessing the Il Sin account at Fifth Third Bank.

Brian Adams: Adams's account had a loss of $9,800 from two counterfeit checks. One of the checks was returned, but the other went through and was deposited in a TCF account belonging to James White, Jr. On another occasion, Alaka used a fake ID bearing his picture and the

name "James White, Jr." to withdraw $4500 from a Washington Mutual account. In his post-arrest statement, Alaka also admitted to using the personal identification information for James White, Jr. to open a separate account at a different, unspecified bank.

Ray Anthony White: White's account had a loss of $2,800 from an online check that went to pay off a Master Card held in the names of Jillian Campione and Travis Tolle. This same credit card was implicated with transfers from the Lichtenberg account. "Travis Tolle" is a known alias of Alaka.

Cahn Tran: The Tran account had a loss of $59,000 in the form of online transfers and online bill payments. Two of the bill payments went to an account at Charter One under the name "Il Sin." A photograph shows Adams, a co-conspirator, withdrawing money from this account. Alaka had previously withdrawn money from an account belonging to "Il Sin" at Fifth Third Bank. Two other online transfers from the Tran account went through a Chase account and eventually ended up in an account opened by Alaka.

Paul Battaglia: Battaglia lost $24,200 in the form of online bill payments and a counterfeit check. Online payments were directed to a Charter One account held under the name "Il Sin," a known alias of Alaka. An additional online bill payment went to the Chase account from which payments to Alaka originated following withdrawals from Tran.

These losses total $224,627.13. Alaka admits responsibility for taking an additional $42,600 from Sean Williams,

James White, Thomas Michael, and Michael Su. Together, the two amounts add up to $267,227.13. The district court found the conspiracy as a whole to be liable for $267,227 in losses.

The Presentencing Investigation Report ("PSR") recommended a guideline sentencing range for Alaka of 24-30 months. The district court sentenced Alaka to 24 months and ordered restitution in the amount of $267,000, for which appellant was jointly and severally liable with his co-conspirators. Alaka appeals, arguing that he is responsible only for less than $200,000 in losses,[1] which would have yielded a guideline sentencing range of 18-24 months.

## II.  Discussion

Alaka contends that the district court's determination that he was responsible for the entire loss attributable to the conspiracy was faulty and requires a remand for resentencing. We review the district court's factual findings at sentencing for clear error. *United States v. Severson*, 569 F.3d 683, 689 (7th Cir. 2009). We will hold a district court's finding of fact to be clearly erroneous if, based upon the entire record, "we are left with the definite and firm conviction that a mistake has been committed*." United States v. Carani*, 492 F.3d 867, 875 (7th

---

[1] The specific amount of loss for which Alaka acknowledges responsibility is unclear from appellant's brief, but does not affect the resolution of this case.

Cir. 2007). The district court's determination that Alaka, through the conspiracy, was responsible for $267,000 in loss is not clearly erroneous.

The government did not have to prove that Alaka personally engaged in or benefitted from every transaction that resulted in the $267,000 loss. Rather, the government had to establish only that activities leading to the loss were reasonably foreseeable to Alaka as part of the charged conspiracy. *United States v. Bustamante*, 493 F.3d 879, 887-88 (7th Cir. 2007) ("[I]n the case of jointly undertaken criminal activity, a defendant's base offense level 'shall be determined on the basis of . . . all reasonably forseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'"). Agent Speedy's testimony indicated that Alaka worked with his co-conspirators to obtain personal information, created false identification cards, and even traveled to certain branches with Tomita to withdraw money. The government also showed that Alaka lived with Adams while the conspiracy was taking place and that appellant withdrew money for or transferred money to Adams on several occasions. On this record, the district court reached the permissible conclusion that all of the fraudulent transactions described above were reasonably foreseeable to Alaka and carried out in furtherance of the same conspiracy to use access devices. *See United States v. Adeniji*, 221 F.3d 1020, 1028 (7th Cir. 2000) (finding an inference of a joint undertaking proper where the defendant "took virtually identical" steps as co-conspirators in perpetuating the fraud and coordinated his activities via phone).

Appellant disputes this conclusion. He alleges that he restricted his own conduct to withdrawing funds from certain victim accounts by using a fake ID, and could not expect his cohorts to use counterfeit checks or online transfers to do the same. Alaka also claims that he could not foresee the attacks his co-conspirators mounted on accounts when he was not around. The district court duly considered both positions at sentencing and rejected them. On the record before us, we find no fault in this outcome. Alaka is responsible for the actions of his co-conspirators even when he is not present for them, so long as the actions are reasonably foreseeable. *United States v. Nubuor*, 274 F.3d 435, 443 (7th Cir. 2001) ("[A] defendant who has conspired with others may be sentenced for drug quantities that he did not handle, so long as he could reasonabl[y] foresee that the drug transaction would occur."). Bits of money withdrawn from a number of the accounts described above eventually trickled down to Alaka, and he never questioned or attempted to investigate the source of this income. Alaka's picture was on several fake pieces of identification, and his various aliases kept popping up in the complex schemes the group set up to funnel money from legitimate accounts into their own pockets. This evidence provided an adequate foundation for the district court's factual findings.

To the extent that the conclusions of the district court contain any error cognizable as a matter of law, said error is limited to the finding that Alaka was responsible for loss from the Krashen account. The fraud leading to the $65,100 loss on behalf of that individual did not

appear to involve any of the fake identities, proxy accounts, or withdrawal locations used by the conspiracy elsewhere. Under the deferential review we accord to district court sentencing decisions, however, this error is harmless because the other, properly established fraud totals more than $200,000 and pushes Alaka into the 24-30 month guideline range. *Cf. United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009). *But see United States v. Eubanks*, 593 F.3d 645, 655-56 (7th Cir. 2010) (holding that where a properly calculated guideline range did not include the sentence handed down by the district court and the district court did not provide reasons for handing down a non-guideline sentence, a guidelines-calculation error was not harmless).

### III.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.