In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3459

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DARRELL W. THOMAS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 95-CR-40066-JPG--J. Phil Gilbert, Chief Judge.

ARGUED JANUARY 12, 2001--DECIDED March 25, 2002

Before RIPPLE, ROVNER, and EVANS, Circuit
Judges.

ROVNER, Circuit Judge.  The evidence in
this case leaves little doubt that
Darrell Thomas is a drug dealer--the
government has him on tape brokering
several crack cocaine sales to its
cooperating witness, Mable Jones. Thomas
has never been charged with distributing
narcotics, however. Twice the government
has tried him (and twice a jury has
convicted him) for conspiring to
distribute crack with Jones and her
associates. Another panel of this court
reversed Thomas's first conviction and
remanded for a new trial based on the
district court's failure to instruct the
jury that if the relationship between
Jones and Thomas was no more than that of
buyer and seller, Thomas was not guilty
of conspiracy. United States v. Thomas,
150 F.3d 743 (7th Cir. 1998) (per
curiam). At that time, the court
expressed doubts about the evidentiary
basis for the conspiracy charge and
hinted broadly that the government would
be on much firmer ground pursuing
substantive charges against Thomas. Id.
at 744-45; see also id. at 747
(Easterbrook, J., concurring). The
government did not take the hint. On
remand, Thomas again was tried, and
convicted, of conspiring with Jones and
her cohorts. We must now decide whether

the evidence was sufficient to permit the jury to convict Thomas on the conspiracy charge. We conclude that it was not.

I.

Mable Jones ("Mrs. Jones" or "Jones") and her husband Fred began to purvey crack cocaine to the residents of public housing projects in Mounds, Illinois, in 1993. At first, Mr. Jones handled the sales end of the operation and Mrs. Jones cut the drugs and handled the finances. After a stroke in March of 1995 left Mr. Jones confined to a wheelchair, Mrs. Jones assumed a more active role in their trafficking operation.

Typically, the Joneses acquired crack cocaine in quantities of one-sixteenth of an ounce. They would then break those quantities into "rocks" that were sold to users for $20 each. Dennis Mallard worked as a retail distributer for the Joneses; he was also the boyfriend of Shirley Smith, Mr. Jones' daughter. For every $100 worth of crack that Mallard sold to their customers, the Joneses gave him $20 in cash or the equivalent in crack cocaine. After Mr. Jones' stroke, Mallard and Smith moved into the Joneses' residence.

As May of 1995 drew to a close, the Joneses needed to replenish their supply of crack. Because most of the Joneses' customers received public assistance, the peak demand for their product occurred at the beginning of each month, when public aid recipients receive their checks. The Joneses had a number of different sources from which they purchased crack cocaine, including individuals in Cairo, Illinois, Detroit, Michigan, and Charleston, Missouri. With the first of June approaching, the Joneses, along with Mallard and Smith, decided to drive across the Mississippi River to Charleston and attempt to locate a source of Mallard's known to them as "Snake."

As the group drove around Charleston looking for Snake, they chanced upon Darrell Thomas, who flagged them down. Thomas asked them whether they were "looking." Tr. 92. After Thomas ascertained that they were interested in buying some crack, he led them to a green house in Charleston and instructed Mrs. Jones to park in the rear. Thomas entered

the house alone, leaving the others waiting in the car. A short while later, another individual arrived at the house on a motorcycle, met with Thomas, and then left. Thomas re-joined the others in the car and ascertained that the Joneses were willing to pay $600 for a half ounce of crack cocaine. Eventually, the motorcycle rider returned to the house (this time in an automobile) and handed something to Thomas. While his source waited, Thomas delivered a half ounce of crack cocaine to the Joneses in exchange for $600 in cash. Thomas then met briefly with his supplier, the supplier departed, and Thomas re-joined the others. When Mable Jones asked about the possibility of future transactions, Thomas told her to "just come over and look him up." Tr. 96.

Mrs. Jones and her entourage subsequently returned to the green house and conducted a second transaction with Thomas. After ascertaining that the Joneses were again interested in a half ounce of crack cocaine, Thomas left the house, returned after an interval of ten to fifteen minutes, and then sold them the quantity they had requested.

At a later date, the Joneses, Mallard, and Smith returned to Charleston looking for Thomas. Upon arrival at the green house where they made their first and second deals with Thomas, they discovered he had moved to a white house elsewhere in town. They managed to catch up with Thomas at his new residence and were again able to arrange the purchase of a half ounce of crack cocaine. At that time, Thomas provided the Joneses with his telephone and beeper numbers.

Thomas turned out to be the Joneses' sole source of crack cocaine from late May through July of 1995. According to Mable Jones, they made at least four purchases of crack from Thomas during that two-month period, including the three transactions we have just described.

On July 26, 1995, members of a federal public housing narcotics task force executed a search warrant upon the Joneses' residence in Cairo, Illinois. Among other signs of drug trafficking, the agents discovered approximately seven grams of crack. Fred and Mable Jones,

Shirley Smith, and Dennis Mallard all were present when the search was conducted (in addition to Freda Smith, another of Mr. Jones' daughters), and they quickly agreed to cooperate with the authorities in exchange for leniency. Mable Jones told the agents that she had obtained the cocaine discovered in the search from Thomas, and she agreed to make further purchases from Thomas under government supervision.

On the following day, July 27, Jones returned to Charleston in the hope of making her first controlled purchase from Mr. Thomas. She was unable to locate him on that occasion, however.

On July 30, Mable Jones, accompanied by her husband, Smith, and Mallard again traveled to Charleston intending to make a controlled buy from Thomas. Mrs. Jones was wearing a wire transmitter so that her conversation with Thomas could be recorded. This time, they were able to locate Thomas, but he had nothing to sell them. "Ain't nothing happening here," he told Mrs. Jones. Gov. Ex. 5-A at 2. Mrs. Jones reminded Thomas that the first of the month was approaching and that she needed to replenish her stock of cocaine. "We can go to Kentucky to see if we can find some," Thomas told her. Id. "[But there] [a]in't nothing happening over there. Unless you buy a piece so small." Id. Mrs. Jones continued to fret. "[T]here's a little bit over in Sikeston," Thomas allowed, "but you ain't going to get no weight." Id. at 4. "And see, a little bit ain't gonna help," Mrs. Jones replied. "I need the weight." Id. (Mrs. Jones considered "weight" to be a quantity of one-half ounce or more.) Thomas assured Mrs. Jones that he would continue to look for a source. "I'll do some more calling this evening then and I'll let you know something tonight," he told her. "I'll give you a call just for the hell of it, you know." Id.

Two days later, on August 1, Mable Jones (again wearing a wire) and Mallard made another attempt to purchase cocaine from Thomas, and this time they met with success--or so they thought. After meeting Thomas at the white house, the three of them drove around town looking for a supplier. Ultimately they found someone, from whom Thomas obtained what appeared to be a half ounce of crack

cocaine in exchange for $600. The substance that Thomas gave them turned out to be shaved wax, however--a fact that Jones and Mallard did not discover until the government tested the material. Thomas had urged Mrs. Jones not to pay for the cocaine without testing it first, but by the time the deal was consummated, Jones had been in a hurry to leave. When Mrs. Jones subsequently had a monitored telephone conversation with Thomas to complain about the fraud that had been perpetrated on her, Thomas chastised her for having ignored his advice to test the drugs before parting with her money. Thomas promised to check into the matter and assured her that he would try to get her money back or the genuine article.

On August 2, the Joneses and Mallard drove over to Charleston, picked up Thomas, and cruised about town looking for the people that had supplied Jones with the shaved wax. The search was unsuccessful, and the Joneses and Mallard returned to Cairo. When Mable Jones arrived back at home, she found a message from Thomas on her answering machine informing her that he had located "some dope" for the Joneses. Tr. 172. Late that evening, the Joneses and Mallard drove back to Charleston and met with Thomas. Thomas subsequently took them to a housing project in Charleston, where the Joneses were able to acquire a quantity of crack for $300. This transaction was both recorded and monitored by government agents.

On August 7, Mable Jones placed a monitored telephone call to Thomas. Thomas asked her "[h]ow that other thing worked out," evidently referring to the August 2 cocaine purchase he had brokered. Tr. 178. Mrs. Jones indicated that she was satisfied with the product, and in an apparent reference to the people who had sold her the crack, Thomas remarked "[T]hese, these my boys." Id.

On the following day, Mrs. Jones and Mallard returned to Charleston to make a final controlled buy from Thomas. After they met up with Thomas, he directed them to a house in the country. Before going inside to obtain the cocaine, he assured Mrs. Jones that he would try to make the deal on favorable terms. When he emerged from the house, Thomas indicated to Jones that he had urged the supplier to give

her a more favorable quantity than the supplier first proposed. "He was going to sell you those fifties, but I told him look, come on." Def. Ex. 16 at 19; see also id. at 21. Ultimately, Mrs. Jones purchased $250 worth of crack. Mallard smoked some of the cocaine in order to make sure that it was genuine. Before Jones and Thomas parted ways, Thomas indicated to her that he could obtain additional quantities of crack cocaine for her from "a[n] old boy down in Arkansas" at a price of $800 or $900 per ounce. Id. at 22.

Judith Riley, who lived with Thomas during this time period, confirmed that Thomas had a number of dealings with Mable Jones. She testified that Mrs. Jones came to the green house on two or three occasions and to the white house on three or four occasions.

Finally, pursuant to Federal Rule of Evidence 404(b), several of Thomas's other customers testified that they obtained crack from Thomas on one or more occasions. So far as the record discloses, none of these individuals had any connection to the alleged conspiracy between Thomas and the Jones contingent.

In September 1995, a grand jury returned an eight-count indictment against Thomas, Fred and Mable Jones, and Dennis Mallard, along with Nathaniel Gause--apparently one of the Joneses' customers. R. 1. Count One, the sole count of the indictment naming Thomas, charged him and the other defendants with conspiring to distribute, and to possess with the intent to distribute, crack cocaine. Id. at 1; see 21 U.S.C. sec.sec. 841(a)(1), 846. In May 1996, a jury convicted Thomas on the conspiracy charge. Thomas appealed the conviction, arguing that the district court had erroneously refused his request for a buyer-seller jury instruction. See Seventh Circuit Criminal Pattern Instruction No. 6.12 (1999). Because the evidence readily supported the notion that Thomas sold crack to Mable Jones without an agreement to commit a crime other than the sale itself, see United States v. Lechuga, 994 F.2d 346, 347 (7th Cir.) (en banc) (plurality), cert. denied, 510 U.S. 982, 114 S. Ct. 482 (1993), we agreed that the district court was obliged to give the buyer-seller instruction to the jury:

None of the evidence suggests that Thomas had any stake in Jones's profits from the Cairo market; all deals were cash on the barrelhead. None of the evidence necessarily establishes that Thomas and Jones agreed to "commit any crime other than the crime that consists of the sale itself." Their transactions were episodic. A frequent customer at McDonald's does not agree to eat his next burger there, rather than at Burger King, and although an enduring commercial relationship may support an inference that agreement has been reached, see Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S. Ct. 1265, 87 L.Ed. 1674 (1943); Lechuga, 994 F.2d at 350, the jury should be told that agreement-- the crime of conspiracy--cannot be equated with repeated transactions. This is the office of the buyer-seller instruction. It reminds juries that distribution of drugs is not itself conspiracy, although a history of transactions may be evidence of conspiracy. A jury readily could have concluded that Thomas and Jones dealt without any express or implied undertaking to commit any future crime cooperatively, making them substantive offenders but not conspirators. The district court therefore erred in declining to give a buyer-seller instruction. . . .

150 F.3d at 745. We pointed out that any debate as to whether Mrs. Jones and Thomas were simply buyer and seller, rather than co-conspirators, could have been avoided had the government chosen to pursue substantive charges against Thomas rather than the conspiracy charge. Id. at 744-45. "But it is not our task to decide whether prosecutorial and judicial resources have been squandered by poor charging decisions; we must resolve the questions presented in consequence of those decisions." Id. at 745. Based on the instructional error, we returned the case to the district court for re-trial.

On remand, the government elected to prosecute Thomas a second time on the conspiracy charge. In advance of the second trial, the government re-filed a notice pursuant to 21 U.S.C. sec. 851 indicating that in the event of his conviction, Thomas would be eligible for enhanced punishment based on two prior

convictions for felony drug offenses. R. 276. Thomas represented himself at the second trial with the aid of stand-by counsel. After hearing the evidence, and after being properly instructed as to the distinction between a conspiracy and a simple buyer-seller relationship, the jury again convicted Thomas of conspiracy. R. 327. Thomas contended by way of a post-trial motion that the evidence was insufficient to convict him of conspiracy, but the district court rejected this argument. "In presenting its case, the government introduced tape recorded conversations of controlled purchase[s] made between defendant and his co-conspirators. These tape recordings clearly indicate [that] Mr. Thomas actively participated in the conspiracy with which he was charged." R. 341 at 5. Based on Thomas' criminal history, the district judge sentenced Thomas to a mandatory term of life imprisonment. R. 373.

II.

Thomas' second appeal requires us to revisit the distinction between a narcotics conspiracy and a simple buyer-seller relationship. This time around, however, the question is not whether the jury was properly instructed on the distinction, but whether the evidence was sufficient to support the jury's verdict. In making that assessment, we must examine the evidence in the light most favorable to the prosecution and ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original).

The essence of conspiracy is, of course, an agreement to commit a crime. United States v. Shabani, 513 U.S. 10, 16, 115 S. Ct. 382, 386 (1994); Iannelli v. United States, 420 U.S. 770, 777, 95 S. Ct. 1284, 1289 (1975); United States v. Lechuga, supra, 994 F.2d at 349 (plurality). In this case, the alleged agreement was one to distribute crack cocaine and to possess crack cocaine with the intent to distribute. As we noted at the outset, the government's evidence, if believed, leaves little doubt that Thomas was a purveyor of crack. Proof that Thomas sold a distribution quantity of crack cocaine to Jones on one or more

occasions does not by itself establish that Thomas conspired with Jones and her associates, however. As we explained in Lechuga:

A conspiracy is not merely an agreement. It is an agreement with a particular kind of object--an agreement to commit a crime. When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required in such a case is an agreement to commit some other crime beyond the crime constituted by the [sale] agreementitself.

994 F.2d at 349 (plurality); see also United States v. Torres-Ramirez, 213 F.3d 978, 981 (7th Cir. 2000).

The crime that Thomas allegedly agreed to commit separate and apart from the sales to Jones was the distribution of crack cocaine to Jones' customers. E.g., Gov't Br. 16; Tr. 75-76, 661, 669. The government's theory, in other words, was that Thomas did not simply make a series of spot sales to Mrs. Jones, but that he "join[ed] both mind and hand" with Jones and her retinue to facilitate the distribution of crack cocaine to Jones' customers. See Lechuga, 994 F.2d at 350 (plurality), quoting Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S. Ct. 1265, 1270 (1943). Our cases have cited a number of factors that shed light on whether the parties to a sale of narcotics are merely buyer and seller or instead are co-conspirators who share an interest in the redistribution of those narcotics. These include the period of time over which the buyer and seller transact business, the method by which the buyer pays for the narcotics, the quantities of drugs involved, whether the transactions were standardized in some way, and whether or not there was a mutual trust between the buyer and seller. E.g., United States v. Sanchez, 251 F.3d 598, 602 (7th Cir.), cert. denied, 122 S. Ct. 300 (2001); United States v. Contreras, 249 F.3d 595, 599 (7th Cir.), cert. denied, 122 S. Ct. 258 (2001). None of these factors is dispositive, nor is the listing exhaustive. In the end, what we are looking for is "evidence of 'a prolonged and actively pursued course of sales coupled with the seller's knowledge of

and a shared stake in the buyer's illegal venture.'" United States v. Pearson, 113 F.3d 758, 761 (7th Cir.), cert. denied, 522 U.S. 1035, 118 S. Ct. 641 (1997), quoting United States v. Clay, 37 F.3d 338, 341 (7th Cir. 1994).

The jury reasonably could have found that Thomas was aware of the reason why Jones was purchasing crack cocaine from him. Thomas was repeatedly selling her distribution-sized quantities of crack cocaine--larger quantities, in fact, than Mr. and Mrs. Jones had historically purchased before they met Thomas. Indeed, Thomas' acknowledgment to Mable Jones in late July that he knew the first of the month was approaching arguably reflects an appreciation of the time at which she faced peak demand from her own customers. So it is a fair inference that Thomas knew Jones was purchasing the crack for re-sale. It is also a fair inference that Thomas knew Jones was not distributing the cocaine by herself: whenever she traveled to Charleston to transact business with Thomas, she was always accompanied by her husband, Smith and/or Mallard. In short, it would have been reasonable for the jury to conclude that Thomas knew that she was conspiring with others to distribute the crack cocaine with which he was supplying her.

That Thomas was aware of the conspiracy to distribute narcotics does not establish his membership in the conspiracy, however. As we observed in Torres-Ramirez, "Knowing of a conspiracy differs from joining a conspiracy." 213 F.3d at 982 (emphasis in original). One who deals in larger quantities of narcotics will invariably realize that his buyer intends to resell, and that in all likelihood he will have help from others in doing so. Id. That knowledge alone does not render the seller liable as a co-conspirator. Id., citing Lechuga, 994 F.2d at 347-50; see also United States v. Rivera, 273 F.3d 751, 755 (7th Cir. 2001). The evidence must in some way show that the seller agreed to become a member of the conspiracy. See, e.g., United States v. Larkins, 83 F.3d 162, 166 (7th Cir. 1996).

If one looks at the entire course of dealing between Thomas and Jones, as the jury was invited to do, one can see some signs that Thomas was attempting to

accommodate Jones (or at least give her the impression that he was), and so to retain her as a customer. Ultimately, however, we can find no evidence that Thomas ever shared with Jones a stake in the success of the retail sales to Jones' customers of the cocaine with which he supplied her.

First, Jones and Thomas conducted a modest number of transactions (seven) over a relatively brief period of time (about ten weeks). It would be an exaggeration to describe their dealings as prolonged either in a numeric or a temporal sense. On the contrary, "[t]heir transactions were episodic." Thomas I, 150 F.3d at 745. Our point here is not that it is either impossible or unlikely for a buyer and seller to become co-conspirators over the course of a few transactions or a few weeks. It is simply that the limited extent of the affiliation between Thomas and Jones on its face gives us no clue as to the existence of any criminal agreement between them. See Lechuga, 994 F.2d at 349-50; see also Rivera, 273 F.3d at 755.

Second, as we pointed out in Thomas I, Mrs. Jones paid for all of her purchases from Thomas in cash. Thus, in contrast to the scenario in which the seller "fronts" the drug to his buyer, Thomas had no direct stake in the resales to Jones's customers. See Rivera, 273 F.3d at 755-56. True, Thomas profited from his sales to Mrs. Jones. But Thomas made his money at the point of sale; his profit did not depend on the Joneses' subsequent success in distributing the cocaine to their customers. Cf. United States v. Adkins, 274 F.3d 444, 450-51 (7th Cir. 2001).

Third, although one could say that the transactions between Jones and Thomas followed a pattern, there was nothing standardized about them. When Jones needed to replenish her supply, she would locate Thomas and he, in turn, would attempt to find a source of crack for her. The source was not always the same (as revealed by the wax incident), nor was the amount of cocaine that Thomasmanaged to locate (as evidenced by the last two transactions, which involved smaller quantities). In short, there was nothing in the way that the transactions were arranged that revealed any degree of commitment between Jones and Thomas. So

far as the record reveals, this was a series of spot transactions that Thomas brokered on an as-needed, as-able basis. When Jones came calling, Thomas wentlooking; that was it. See Rivera, 273 F.3d at 756.

Fourth, nothing in the evidence bespeaks a mutual trust between Jones and Thomas. Practically speaking, the final sale that Thomas negotiated on Mrs. Jones' behalf was little different from the first, when Thomas flagged the Joneses down in the streets of Charleston. Thomas negotiated a purchase price with Jones, then left her waiting outside in the car while he negotiated separately with a supplier, from whom he presumably earned his commission. So far as the record reveals, Jones and Thomas had no commitments to one another: Jones was free to patronize other suppliers (or brokers), and Thomas was under no obligation to meet Jones' needs (which he did with varying degrees of success). From the first transaction to the last, Jones always paid for the cocaine in cash. And, as the incident with the phony cocaine reveals, Thomas bore no responsibility for the quality of the crack that he located for Jones. Although Thomas promised Jones that the wax shavings would be replaced either with genuine crack or her money back, that promise was never fulfilled. Thomas went looking for the supplier who defrauded her, but when the search proved in vain, it was Jones who bore the loss (or rather the government, since by this time she was a cooperating witness), not Thomas.

As we have acknowledged, the evidence does suggest that Thomas made some effort to please and keep Jones as a customer. At the conclusion of the second transaction, Thomas gave Jones his telephone and beeper numbers. When, in late July, he was unsuccessful in finding a supplier to consummate a transaction with Jones, he assured her that he would keep trying to find her one by the beginning of the month, when he knew she would need the supply. When the supplier he subsequently found turned out to have supplied Jones with shaved wax, he promised Jones that the matter would be corrected and went looking with her for the wayward supplier. After an unsuccessful search, Thomas eventually located another supplier and telephoned

Jones to let her know. During the August 8 transaction, Thomas twice assured Jones that he was pushing the seller to make the deal on terms more beneficial to her (although this may simply have been puffing on his part). And, at the conclusion of that last transaction, Thomas told Jones that he had a source in Arkansas who could offer her crack in larger quantities and at a more favorable price.

These efforts certainly reflect an ongoing effort to cultivate Jones as a customer; what they do not reflect is a shared stake in the success of Jones' distribution enterprise. Thomas did what any good haberdasher might do--he got to know his customer's needs and aimed to meet them. See Rivera, 273 F.3d at 756. ("The government showed only that [the defendant] wanted [his customer's] business--that is indicative of a buyer-seller relationship, not a conspiracy.") What he did not do was offer cocaine to Jones on terms--sale on credit, for example, or volume discounts-- that gave him an interest in the re-sale of the cocaine to Jones' customers. Thomas may have been Jones' sole supplier in the eight weeks prior to her arrest, but nothing in the manner or terms of the sales supports the inference that this was the result of an agreement between them. Indeed, the record does not even tell us whether Jones was Thomas's sole customer at that time or one of a hundred. Chance brought the two of them together, and so far as the evidence reveals, their subsequent course of dealing amounted to no more than a series of mutually-satisfactory, spot transactions.

Even if the ongoing efforts that Thomas made to serve Jones as a customer can be construed as a sign that the relationship between them was developing into something more than a simple buyer-seller arrangement, it bears emphasis that most of these efforts occurred after Jones and her collaborators began to cooperate with the government. On July 26, when the search warrant was executed on the Jones household, the conspiracy was at an end. After that point, every putative member of the conspiracy but Thomas was cooperating with the government. As their goal was not to commit a crime but to expose one, there could be no genuine

agreement between any of them and Thomas. See Contreras, 249 F.3d at 599, citing United States v. Mahkimetas, 991 F.2d 379, 383 (7th Cir. 1993). The evidence must therefore support a finding that Thomas entered into an agreement with Jones and/or one of her associates prior to the point at which they began to cooperate with the government on July 26./1

The transactions between Jones and Thomas that occurred prior to July 26 do not themselves demonstrate the existence of a collaborative relationship between them. We know that (1) in late May, Thomas flagged Jones down as she and the others were driving about Charleston, brokered the sale of a half ounce of crack, and told Jones to look him up when she inquired about the possibility of future sales; (2) Thomas brokered at least three more sales to Mrs. Jones prior to the July 26 search of the Jones residence, for a total of at least four sales; (3) at the conclusion of the third sale, Thomas gave Jones his telephone and beeper numbers; (4) Thomas was Jones' exclusive source of crack cocaine between late May and late July. These facts do not alone evidence an agreement between Thomas and Jones. At most, they establish a series of four, spot-market, cash transactions. The terms of these transactions were apparently satisfactory enough to Jones that she continued to seek Thomas when she needed more crack cocaine, and sufficiently advantageous for Thomas that he supplied his contact information to Jones and continued to do business with her. But there is nothing in the facts that suggests even a commitment to future sales, let alone some interest in the success of Jones's re-distribution of the cocaine to her customers. See Rivera, 273 F.3d at 755-56 (multiple sales alone do not establish conspiracy); Contreras, 249 F.3d at 600 (same); Torres-Ramirez, 213 F.3d at 982 (supplying narcotics purchaser with pager number does not prove a conspiratorial agreement). Indeed, when Jones was asked whether there was a reason why Thomas was her one and only source between May and July of 1995, she responded, "Not really." Tr. 108.

Although any conspiracy terminated as of July 26, one might still look to later events for clues about what the nature of

the relationship between Thomas and Mable Jones, et al., was prior to that date. See generally United States v. Betts, 16 F.3d 748, 757-58 (7th Cir. 1994), abrogated on other grounds by United States v. Mills, 122 F.3d 346 (7th Cir.), cert. denied, 522 U.S. 1033, 118 S. Ct. 637 (1997). But if Thomas did not come to an agreement with Jones and the others until after July 26 (when everyone except he became an agent of the government), then the jury could not lawfully convict him of conspiracy. That presents a problem. The jury in this case was never asked to decide whether Thomas had become a conspirator as of July 26, nor was it instructed that it could consider later events only insofar as they shed light on what Thomas's intent (for example) was prior to that date. See, e.g., Tr. 649-50 (final jury instructions) ("The indictment charges that the offense was committed on or about January 1994 to August 1995. The government must prove that the offense happened reasonably close to that date, but is not required to prove that the alleged offense happened on that exact date.") Neither party alerted the court to the evidentiary significance of July 26 as the end date of the conspiracy. Instead, the jury was invited to consider the entire course of dealing between Thomas and Jones--from late May through early August--as substantive evidence that Thomas conspired with Jones and the others. See, e.g., Tr. 78-81 (government's opening statement); Tr. 660-69 (government's closing argument). The strongest (which is not to say strong) evidence of Thomas's participation in the conspiracy--his efforts to deal with the shaved wax, his August 2 telephone call advising her that he had located another source of cocaine, his August 7 remark vouching for the bona fides of that source, his avowed efforts on August 8 to sweeten the terms of the deal for her, and his reference to a source in Arkansas from which she might purchase crack at a better price--all post-dates the July 26 termination of the conspiracy. Consequently, the jury may have convicted Thomas of conspiracy based on what he did on July 30, or August 2, 7, or 8, without considering whether he actually entered into an agreement with anyone before the conspiracy ended on July 26. Given the obvious and inescapable importance of July 26, the

failure to appropriately instruct the jury amounts to plain error, see Thomas I, 150 F.3d at 745; and that error would, at the very least, require a new trial.

Based on the evidence before us, however, we do not believe that a third trial on the conspiracy charge is warranted. A jury properly instructed as to the end date of the conspiracy and the limited relevance of the acts that took place after that date could not reasonably find that Thomas joined the conspiracy before the search of the Jones residence brought it to an abrupt conclusion. Before July 26, Thomas had brokered four spot sales of crack to Jones for cash. The most he had done by way of an arrangement with Jones vis a vis future transactions was to give her his telephone and beeper numbers. What Thomas did with and for Jones after July 26 may have signaled an increasing level of cooperation between the two, but even assuming for the sake of argument that his later efforts were the acts of a co-conspirator rather than a mere seller, those efforts do not show that Thomas entered into an unlawful agreement before the key date of July 26. In other words, whatever later events may reveal about Thomas' status at the time they occurred, they shed no light on his status prior to July 26: they do not, for example, reveal a prior understanding with Jones or a pre-existing stake in the success of her sales. See generally Betts, 16 F.3d at 758 (noting the difficulty of inferring prior intent from subsequent acts).

III.

No doubt the evidence would support a charge against Thomas for distributing narcotics. He was not indicted for that offense in this Circuit, however, because venue for that charge would properly lie only in the Eastern District of Missouri, where the sales to the Jones group took place. Fed. R. Crim. P. 18; United States v. Rodriguez-Moreno, 526 U.S. 275, 278-79, 119 S. Ct. 1239, 1242-43 (1999); Rivera, 273 F.3d at 756; Torres-Ramirez, 213 F.3d at 981. Because the trial evidence was insufficient to support Thomas' conviction on the conspiracy charge, we REVERSE his conviction.

FOOTNOTE

/1 The government raises the possibility that although Fred and Mable Jones, Smith, and Mallard were no longer participants in the conspiracy after July 26, the conspiracy may nonetheless have continued among its other members. Gov't Br. at 20. Yet the government cites no other individuals who might have carried on the conspiracy with Thomas, and we can find no evidence of such individuals in the record. Consequently, there can be no doubt that the conspiracy ended on July 26.

EVANS, Circuit Judge, dissenting. Darrell Thomas dodged a bullet in 1998 when we reversed his conviction for conspiracy to distribute cocaine. United States v. Thomas, 150 F.3d 743 (7th Cir. 1998). We reversed because the district court declined to give a "buyer-seller" jury instruction as Thomas had requested. Noting that the evidence presented against Thomas "was as consistent with intermittent sales as it was with criminal conspiracy," we concluded that Thomas was prejudiced by the failure to give the "buyer-seller" instruction./1 We ordered a new trial.

Upon remand, the case was retried, a buyer-seller instruction was given (it was Seventh Circuit Pattern Instruction 6.12), and Thomas was again convicted. Today's majority opinion reverses the new conviction, so Thomas has dodged another bullet. Because I think the majority has usurped the province of the jury, I respectfully dissent.

The line separating conspiracy from a mere buyer-seller relationship is not very bright. In a case like this, under our system of criminal procedure, it is a properly instructed jury that decides on which side of the fuzzy line a defendant's conduct falls. That seems to me to be the message we sent the first time we saw this case when we found the evidence, as I have previously quoted, to be "as consistent with intermittent sales as it was with criminal conspiracy."

The fatal flaw in the majority's approach to this case is that it strains to infer what the evidence does not tell us, rather than follow our usual course and review the evidence in the light most favorable to the verdict. Thomas' challenge today is nothing more than a challenge to the sufficiency of the evidence, and we have often held that we will set aside a verdict on this ground "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." United States v. Brack, 188 F.3d 748, 760 (7th Cir. 1999).

The evidence in this case does not show that a sophisticated Tony Soprano-Paulie Walnuts-Uncle Junior type criminal conspiracy was at work here. But we have observed that the "loosely-knit ensemble" of a drug conspiracy "can consist of an implicit understanding between the parties regarding the subsequent resale of drugs." United States v. Smallwood, 188 F.3d 905, 912. A conspiracy agreement, we have also observed, can be established by circumstantial evidence. United States v. Brisk, 171 F.3d 514, 516 (7th Cir. 1999). And that, I think, is what we have here.

The jury could have believed (and apparently did believe) that Thomas and the Joneses (primarily Mable) conspired to distribute crack for a 3-month period ending when the Joneses were busted by officers from the federal public housing narcotics task force on July 26, 1995.

If the only thing the evidence showed was that the Joneses bought personal-use-size quantities of crack from Thomas, nothing more than a simple buyer-seller arrangement would have been shown. But that's not what we have here. The evidence, viewed favorably to the jury's verdict, is sufficient to shove this case over the fuzzy line into conspiracy territory. It showed that Thomas sold resale-size quantities of crack to the Joneses on four occasions and that the Joneses resold the crack with Thomas's knowledge. Apparently hopeful of providing even more crack for resale, Thomas gave the Joneses his phone and pager numbers so they could get in touch with him more easily. Plus, Thomas had an obvious stake in the Joneses' success--every time he sold them crack for their resale purposes he made money. The more they would sell in the future, the better it would be for Thomas.

To set aside a verdict of a jury--especially after a hard-fought trial--is a drastic step. To do it twice, when the second trial proceeded exactly as we instructed with a proper buyer-seller instruction, is, in my opinion, a grave error. Had we thought the evidence insufficient to support a conspiracy conviction the first time around, the relief we would have ordered would have been a reversal with instructions to enter a judgment of acquittal. It would not have been to order a new trial. The majority's opinion today means the time of 12 jurors, and that of Judge Gilbert, has been squandered while retrying this case.

FOOTNOTE

/1 Although Thomas requested a buyer-seller instruc-tion, he did not object to the failure of the

judge to give one.