UNITED STATES of America, Plaintiff–Appellee,

v.

Wiley JOHNSON, Anthony George, and Columbus N. Malone, Defendants–Appellants.

Nos. 03–3976, 03–4028, 03–4056.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 2004.

Decided April 5, 2005.

Jeremy W. Brown, Office of the United States Attorney, Fort Wayne, IN, for Plaintiff–Appellee.

Thomas L. Kirsch, II, Office of the United States Attorney, Hammond, IN, Matthew D. Soliday, Valparaiso, IN, P. Jeffrey Schlesinger, Hammond, IN, David J. Peilet, Chicago, IL, for Defendants–Appellants.

Before Hon. RICHARD D. CUDAHY, Hon. KENNETH F. RIPPLE, and Hon. ILANA DIAMOND ROVNER, Circuit Judges.

### ORDER

On August 4, 2003, Wiley Johnson, Anthony George and Columbus Malone were convicted of, among other charges, conspiracy to possess with intent to distribute and to distribute crack cocaine in violation of 21 U.S.C. § 846. Each now appeals his conviction, claiming that the evidence was insufficient to support the conspiracy charge. Each also contests the admission of evidence of gang affiliation as unduly prejudicial. Mr. Johnson additionally contests the admission of evidence of an October 2001 possession of crack cocaine. Each defendant also challenges his sentence. We held this case in abeyance pending the Supreme Court's decision in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). For the reasons set forth in this order, we now affirm each of the judgments of conviction. However, in light of *Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621, and this court's decision in *United States v. Paladino*, 401 F.3d 471, 475 (7th Cir. 2005), we order a limited remand with respect to each defendant's sentence.

### A. Sufficiency of the Evidence

Challenging the sufficiency of the evidence is a "daunting task." *United States v. McCaffrey*, 181 F.3d 854, 856 (7th Cir. 1999). "Only when, viewing the evidence in the light most favorable to the government, there is no basis for a rational factfinder to find all of the essential elements of a crime beyond a reasonable doubt will we reverse on this ground." *Id.* The question is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

*United States v. Thomas,* 284 F.3d 746, 751 (7th Cir.2002) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

In order to convict a drug dealer of conspiracy, the Government must show more than a mere buyer-seller agreement. *See United States v. Rivera,* 273 F.3d 751, 755 (7th Cir.2001). "[T]he government must show an agreement to commit a further crime, usually involving the subsequent distribution of drugs by the buyer." *Id.* We have employed four factors to determine the existence of a conspiracy: "1) length of relationship; 2) established method of payment (for example, "fronting"); 3) extent to which the transactions were standardized; and 4) the level of mutual trust between buyer and seller." *Id.* No single factor is dispositive. *See id.* "In the end, what we are looking for is evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture." *Thomas,* 284 F.3d at 752 (internal quotation marks and citations omitted). In order to show that the defendants joined an existing conspiracy, "the government need only show a participatory link between them and the conspiracy.... The government need only show that Defendants knew of the conspiracy and intended to join it." *United States v. Stephenson,* 53 F.3d 836, 846 (7th Cir.1995) (citations omitted).

A conviction of conspiracy to distribute drugs can be supported by proof of the defendant's participation in either a vertical or a horizontal conspiracy. *See United States v. Cerro,* 775 F.2d 908, 914 (7th Cir.1985) (discussing existence of "chain" conspiracies as well as conspiracies in which dealers "sell in parallel, [and] each is a strand, rather than a link"); *see also United States v. Lechuga,* 994 F.2d 346, 349 (7th Cir.1993) ("Vertical integration is

not a condition of conspiracy."); *United States v. High,* 117 F.3d 464, 466 (11th Cir.1997) (upholding conviction in a conspiracy involving sellers "connected in a vertically and horizontally integrated cocaine distribution network"). The Government need not prove whether a conspiracy was vertical or horizontal in order to establish that it existed. *Cf. United States v. Townsend,* 924 F.2d 1385, 1392 (7th Cir. 1991) (indicating primary "need to inquire directly into whether the defendants had a mutual interest in achieving the goal of the conspiracy" and recognizing that "[t]he fact that we can squeeze a group into a hypothetical organizational chart says little about whether a single agreement exists between the members of the group").

■ As detailed below, there was ample evidence for a jury to conclude that a conspiracy existed to distribute drugs in the Concord section of Gary, Indiana and that each defendant knew of the conspiracy and participated in it.

### 1. The Distribution Network

We review first the evidence pertaining to the existence of the alleged drug distribution conspiracy. At trial, the Government presented substantial evidence about the existence of an organized gang known as Concord Affiliated ("CCA") that was involved in the distribution of drugs in the Concord section of Gary, Indiana. Police and FBI agents investigated gang activity in Concord throughout the period charged in the indictment. Cooperating witnesses testified that CCA was a gang and that they were members of it.[1] Witnesses testified that the gang had a hierarchical structure with a clearly established leader, Bobby Suggs, middlemen and lower-level members.

---

1. CCA was also a rap group that produced   and distributed albums under that name.

According to evidence presented at trial, CCA's hierarchical structure was used to distribute drugs in the Concord area. Multiple witnesses testified that Suggs cooked crack cocaine, was the main crack supplier and supplied guns to some gang members. A cooperating witness testified that Suggs wanted the money from the drug sales kept "inside the neighborhood." Tr.IV at 90–91. Testimony also indicated that the middlemen helped Suggs supply the drugs to the street-level sellers. A confidential informant testified that a middleman "would keep the street kind of quiet" when Suggs was cooking the crack so as not to attract police attention. Tr. III at 277. There was testimony that all drug sales in the area after 1994 related to Suggs. Items seized from a gang member's residence in 2001 were introduced, including crack cocaine, equipment used to cook crack cocaine and $1,400 in cash. A forensic expert testified that some of the cooking equipment still carried remnants of crack and cocaine.

The Government also introduced evidence that the gang controlled the distribution of drugs in an area of Concord known as "the hill." Various witnesses testified to having seen drug dealing on "the hill" from 1994 (the beginning of the charged conspiracy) through 2001 (the end of the charged conspiracy). Witnesses testified to seeing drug sales on "the hill" "[a]ll day every day." Tr.III at 109. Cooperating witnesses testified that there were ten to eleven sellers on "the hill," that "you had to be from Concord" to sell there and that certain groups and individuals were kept from selling there. Tr.IV at 141. They also testified that members of the gang were punished for cheating customers because it would interfere "with us making money." Tr.IV at 99.

Cooperating witnesses testified to selling between a quarter ounce and four ounces each per week in the area. Videotapes of street sales on "the hill" were entered into evidence, as well as crack recovered from various arrests and controlled buys in the area. The Government also presented evidence of at least twenty videotaped controlled buys made near "the hill."

Furthermore, the Government introduced evidence of cooperation among the sellers on "the hill." Witnesses testified to the use of lookouts, turn-taking and "fronting" (the lending of drugs among sellers) on "the hill." Lookouts were used so that sellers "wouldn't get caught" if police tried "to sneak up on us." Tr.II at 23. Sellers took turns on "the hill" by asking, when they first arrived, which of the sellers already present was next in line and then waiting until all of the sellers already there had made a sale before making their own sale. This was done to make the drug sales "less noticeable" to the police. Tr.II at 22–23. Dealers "fronted" each other for convenience and to get customers "out of there as soon as possible" to avoid police detection. Tr.II at 28, 30–31. Testimony indicated that drug sales on "the hill" were more organized when Suggs or the middlemen were around.

Evidence also connected drug-dealing activity with gang-related violence. Testimony linked the gang to an arson that resulted in the deaths of two children. The grandmother testified that the gang had set her house on fire because she had called the police on the drug dealers. Both a confidential informant and a cooperating witness confirmed the gang's connection to the fire.[2] Testimony also indicated that most dealers on "the hill" carried guns.

---

2. The Government does not contend that the defendants took part in the fire; however, there is some evidence that two of the defendants knew who started it. See Tr.II at 151–52; Tr.IV at 110–12.

Additional evidence established that CCA was affiliated with another gang, the Vice Lords. Certain hand signs, symbols (including a five-point star and a dollar sign with two bars), a handshake and wearing one's hat tilted to the left indicated Vice Lords membership. Photographs introduced at trial revealed the defendants as exhibiting some of these indicia of Vice Lords membership.

The totality of evidence presented at trial was more than sufficient for a jury to conclude that an agreement existed between multiple individuals to distribute drugs in the Concord area. A jury easily could have found that: (1) large quantities of crack cocaine were distributed by the conspiracy over the charged seven-year period; (2) established methods of payment between sellers existed, including "fronting"; (3) a standardized way of doing business applied, including turn-taking and the use of lookouts; and (4) a level of mutual trust between the sellers and the suppliers existed, as evidenced by the ongoing gang relationship. *See Rivera,* 273 F.3d at 755. Whether viewed as a horizontal or a vertical conspiracy, there was sufficient evidence to support the existence of a conspiracy to distribute drugs in the Concord area among the street-level sellers. *See United States v. Suggs,* 374 F.3d 508, 511 (7th Cir.2004) (concluding in a separate appeal involving these facts that "[t]he evidence supports the conclusion that this was a consistent, long-term distribution conspiracy").

### 2. Evidence Against Each Defendant

#### a. Mr. Johnson

Evidence at trial connected Mr. Johnson with the conspiracy to distribute drugs on "the hill." Cooperating witnesses testified that Mr. Johnson dealt drugs on "the hill." A police officer made an undercover purchase from Mr. Johnson on "the hill" in 1997. According to testimony, Mr. Johnson took turns, was "fronted" drugs, was a lookout and was selling on "the hill" at various times between 1995 and 1999. Various witnesses testified that Mr. Johnson smoked crack and that he sold drugs to support his habit.

A police officer testified that he arrested Mr. Johnson in 1995 in another area of Concord after he observed drug sales taking place out of a vehicle in which Mr. Johnson and others (including Mr. George) were found. The officer found crack in the vehicle. Additionally, an officer found crack on Mr. Johnson in October 2001 in another area of Concord.[3]

---

**3.** Mr. Johnson contests the admission of testimony to the October 2001 possession as a violation of Federal Rule of Evidence 404(b). He argues that the testimony was inadmissible evidence of other misconduct because the possession occurred outside the geographic and temporal scope of the charged conspiracy.

We review the district court's admission of evidence for an abuse of discretion. *See United States v. Spaeni,* 60 F.3d 313, 315 (7th Cir.1995). Under Rule 404(b), evidence of other misconduct "is not admissible to prove the character of a person in order to show action in conformity therewith," but it may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Fed.R.Evid. 404(b). The court must determine whether:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue[;] (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act[;] and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Wilson,* 31 F.3d 510, 514–15 (7th Cir.1994).

The district court did not abuse its discretion in permitting evidence of Mr. Johnson's October 2001 possession. At worst, the event

Moreover, evidence at trial connected Mr. Johnson with the Vice Lords. Cooperating witnesses testified of Mr. Johnson's membership in the Vice Lords. Pictures introduced as evidence depicted Mr. Johnson's tattoos, including five-point stars, and showed him in the company of other gang members wearing a five-point star hat tilted to the left. Witnesses further testified that Mr. Johnson carried a gun.

This evidence was more than sufficient to permit a jury to conclude that Mr. Johnson "knew of the conspiracy" to distribute drugs on "the hill" and that he "intended to join it." *Stephenson,* 53 F.3d at 846.

### b. Mr. George

Evidence at trial also connected Mr. George with the conspiracy to distribute drugs on "the hill." Multiple witnesses testified that Mr. George sold drugs there. Videotaped controlled purchases showed Mr. George making sales in 2000, in an apartment near "the hill" and at another location near Concord. Testimony indicated that Mr. George was a lookout, took turns and was "fronted" drugs, and that he was selling at various times between 1994 and 2001. A confidential informant testified that he had purchased drugs from Mr. George "[o]ver a hundred" times on "the hill," Tr.II at 221, and "about 50" times at a house Mr. George shared with Mr. Malone, Tr.II at 232. There was testimony that Mr. George sold about an ounce of crack per week and that he could get his drugs further up the hierarchical chain

than other sellers because he was friends with a middleman.

Police officers arrested Mr. George in 1994 after they observed him making drug sales. A police officer recovered four packs of cocaine that Mr. George had thrown to the ground at that time. Another police officer testified that he had arrested Mr. George in 1995 in another area of Concord after he had observed drug sales taking place out of a vehicle in which Mr. George and others (including Mr. Johnson) were found. At the time of the arrest, Mr. George was in the front passenger seat, where the dealing had been taking place. The officer found crack in the glove compartment.

Evidence at trial also connected Mr. George with gang activity. Cooperating witnesses testified that he was a member of the Vice Lords. Pictures introduced as evidence depicted Mr. George's tattoos, including five-point stars and a double-barred dollar sign, and showed him with other gang members; one picture showed him holding a gun. Mr. George was also on the cover of a CCA rap album. A phonebook seized from a middleman's residence contained Mr. George's name and number. Testimony indicated that Mr. George had information about the fire but that he would not disclose it "because it would be in violation of CCA code." Tr.II at 151–52. Testimony also indicated that Mr. George carried a gun.

Based on this evidence, a jury easily could conclude that Mr. George "knew of the conspiracy" to distribute drugs on "the

---

occurred a few weeks after the charged seven-year conspiracy. The contested evidence was therefore "similar enough and close in time to be relevant" to Mr. Johnson's knowledge of and participation in the conspiracy. *Id.* at 514. Given all the other evidence connecting Mr. Johnson with the conspiracy, the admission of testimony to the October 2001 possession was not unduly prejudicial. Fur-

thermore, the incident may be considered as within the broad scope of the indictment, which charged a conspiracy "[f]rom at least September 1994 ... and continuing to on or about the Summer of 2001, both dates *being approximate and inclusive ....*" R.12 at 1 (emphasis added). Thus, the district court did not abuse its discretion by permitting this testimony.

hill" and that he "intended to join it." *Stephenson*, 53 F.3d at 846.

### c. Mr. Malone

Evidence at trial connected Mr. Malone with the conspiracy to distribute drugs on "the hill." Testimony established that Mr. Malone sold on "the hill." Two videotaped controlled purchases showed Mr. Malone making sales in an apartment near "the hill." Testimony indicated that he acted as a lookout, took turns with other sellers and was "fronted" drugs from other sellers. Cooperating witnesses testified that Mr. Malone was selling drugs between 1994 and 2001. One witness testified that Mr. Malone sold drugs with him on "the hill" from about 1995 through 2001, "most of the time," seven days a week, Tr.II at 21–22, and that Mr. Malone additionally dealt drugs out of the house that he shared with Mr. George. Testimony indicated that Mr. Malone sold between a quarter ounce and one ounce of crack per week.

Additionally, evidence connected Mr. Malone with the Vice Lords. Cooperating witnesses testified that he was a Vice Lords member. Photos introduced as evidence depicted Mr. Malone with other gang members, making gang signs, wearing his hat to the left, holding a gun and holding cash. Mr. Malone was also on the cover of a CCA rap album. Testimony indicated that he went on revenge "missions" for the gang and that he knew who had started the fire. Tr.IV at 106–07, 111. A witness testified to having seen Mr. Malone with a gun.

As with Mr. Johnson and Mr. George, the evidence was more than adequate for a jury to conclude that Mr. Malone "knew of the conspiracy" to distribute drugs on "the hill" and that he "intended to join it." *Stephenson*, 53 F.3d at 846.

### B. Evidence of Gang Affiliation

The defendants also claim that the evidence of their gang affiliation was unduly prejudicial. Specifically, Mr. Johnson contests testimony of his gang membership, evidence of his tattoos, pictures of him with other alleged gang members and the introduction of recovered gang literature and a letter between gang members indicating gang activity; Mr. George contests the evidence of his tattoos and the letter; Mr. Malone contests testimony that he was a gang member, evidence of his tattoos, pictures of him with other alleged gang members and the letter.

"Evidence of gang affiliation is admissible in cases in which it is relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members." *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997). The district court's admission of gang-related evidence is reviewed for an abuse of discretion. *See id.* We have recognized "the substantial risk of unfair prejudice attached to gang affiliation evidence"; however, it is also true that "under appropriate circumstances, gang evidence has probative value warranting its admission over claims of prejudice." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir.1996).

Clearly, the district court did not abuse its discretion in admitting the contested evidence. The testimony of gang membership, the tattoos, the pictures, the gang literature and the letter all supported the "existence of a joint venture or conspiracy and a relationship among its members" to distribute drugs, *Westbrook*, 125 F.3d at 1007, and particularly each defendant's knowledge of and participation in the drug distribution conspiracy. As such, it was relevant evidence, *see* Fed.R.Evid. 401, and not unduly prejudicial, *see* Fed.R.Evid. 403. Thus, the district court was

on solid ground in admitting it. *See Suggs*, 374 F.3d 508, 511 (holding that admission of gang affiliation and tattoo evidence for the purpose of establishing a connection between CCA and the drug distribution conspiracy was not an abuse of discretion).[4]

## C. Sentencing

Each of the defendants challenges that his sentence violates the Sixth Amendment in that the sentence exceeds the maximum authorized based solely upon facts found by the jury or admitted by the defendant. Because none of the defendants raised this type of argument in the district court, our review is for plain error. *See Booker*, — U.S. at —, 125 S.Ct. at 769; *Paladino*, 401 F.3d 471, 480.

Under the plain error test, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *United States v. Cotton*, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (quoting *Johnson v.*

*United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). " 'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson*, 520 U.S. at 467, 117 S.Ct. 1544).

The defendants, convicted as co-conspirators in a drug conspiracy, received very similar sentences. The district court determined that the base offense level for each defendant was 38 based upon a total of 1.5 kilograms of crack cocaine. *See* U.S.S.G. § 2D1.1(c)(1). Notably, the jury was not asked whether the offenses of conviction involved that quantity. Rather, the jury determined that each defendant was responsible for more than 50 grams of crack cocaine, which was the highest quantity option presented to the jury.[5] The district court then added two levels to each defendant's offense level based on the district judge's finding that a dangerous weapon was used in the commission of the

---

**4.** Additionally, we note that each defendant attempted to incorporate by reference arguments challenging the admission of this evidence made in a brief from the separate appeal of *United States v. Suggs*, 374 F.3d 508 (7th Cir.2004). Although it is clear that co-appellants may incorporate arguments from each others' briefs, *see* Fed. R.App. P. 28(i), it is equally clear that appellants may not incorporate by reference arguments made in briefs from separate cases. *See United States v. Foster*, 789 F.2d 457, 462 (7th Cir.1986) (stating that this type of incorporation method violates Rule 28); *see also United States v. Bichsel*, 156 F.3d 1148, 1150 n. 1 (11th Cir. 1998) (stating that Rule 28 "does not permit such adoption by reference between cases"); *United States v. McDougal*, 133 F.3d 1110, 1114 (8th Cir.1998) (stating that the appellant cannot adopt arguments from briefs in a related but separate appeal under Rule 28 and that the arguments were thus waived).

**5.** In sentencing Mr. Johnson, the district court stated that it "relie[d] on the jury ver-

dict in this case, which found Defendant guilty of distributing more than 1.5 kilograms of crack cocaine, to determine that Defendant should be held liable for distributing the quantity charged in the indictment and proven at trial, beyond a reasonable doubt." R.26 at 3. The Government concedes that this statement is erroneous because the jury only found that the conspiracy involved more than 50 grams of crack cocaine. The court made the same erroneous statement with respect to Mr. Malone's sentence. R.267 at 3–4. In response to Mr. George's challenge to the weight of drugs attributed to him, the district court found that "the length of the conspiracy and the extent of Defendant's involvement therein, both of which were proven at trial, is sufficient to find that, as a member of the conspiracy, he is accountable for distributing in excess of 1.5 kilograms of crack cocaine." R.271 at 4–5. Again, the jury only found that the conspiracy involved more than 50 grams of crack cocaine.

offense. *See* U.S.S.G. § 2D1.1(b)(1). The district court also denied each defendant's request for a reduction in the offense level for being a minor participant based on the judge's finding that none of the defendants was substantially less culpable than his co-conspirators. Accordingly, each defendant's adjusted offense level was 40.

The resulting guidelines sentencing range for both Mr. Johnson and Mr. George was 360 months to life. The district court sentenced both defendants to 360 months' imprisonment. Because Mr. Malone had a lower criminal history category, the resulting sentencing range was 292 to 365 months. The district court sentenced him to 292 months' imprisonment.

In light of the Supreme Court's decision in *Booker*, we have no doubt that the district court erred (and that the error is clear) by increasing the defendants' respective sentences, under the then-mandatory guidelines scheme, based on solely judge-found facts. *See Paladino*, 401 F.3d 471, 480. The Government contends, however, that none of the sentences at issue amounts to plain error because none of the defendants can establish that his substantial rights were affected—that is, nothing in the record supports that the district court would have imposed a lesser sentence had it understood the guidelines to be advisory.

As the Government notes, in sentencing each defendant, the district court stated that the sentence "sufficiently punishes Defendant for his criminal conduct and therefore satisfies the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)." R.263 at 6; R.267 at 6; R.271 at 8. Nonetheless, the record before us does not allow us to "be certain that the judge would not have given a different sentence even if he had realized that the guidelines were merely advisory." *Paladino*, 401 F.3d 471, 480. To enable us to complete our plain error analysis, we shall retain jurisdiction of this appeal and order a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence.[6] Upon limited remand, the district court shall follow the course of action outlined by this circuit in *Paladino*, 401 F.3d 471, 483.

### Conclusion

For the foregoing reasons, we affirm each defendant's conviction, but we direct a limited remand of each defendant's sentence in accordance with the procedure set forth in *Paladino*, 401 F.3d 471, 483.

IT IS SO ORDERED

---

**6.** None of the defendants has argued that the district court's denial of the defendant's request for a reduction in the offense level for being a minor participant, based solely upon the judge's finding that the defendant was not substantially less culpable than his co-conspirators, constitutes error under either the substantive holding or the remedial holding of *United States v. Booker*, ⸺ U.S. ⸺, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). We need not address that issue here because each defendant's sentence contains clear *Booker* error in that the district court enhanced the sentence based solely upon judge-found facts. In any event, the district court can consider its decision not to reduce each defendant's sentence for a minimal role when it evaluates on limited remand whether it would have imposed the same sentence for each defendant under the now-advisory guidelines sentencing regime.